William J. McLEE, Plaintiff–Appellant,

v.

CHRYSLER CORPORATION,
Defendant–Appellee.

No. 896, Docket 96–7736.

United States Court of Appeals,
Second Circuit.

Argued Jan. 23, 1997.

Decided March 25, 1997.

Michael H. Sussman, Goshen, NY (Stephen Bergstein, Sussman, Bergstein, Wotorson & Whately, Goshen, NY, on the brief), for Plaintiff–Appellant.

Laurence B. Liebowitz, Elmsford, NY (Marie L. McCann, Thomas M. Bloomer, Cooper, Liebowitz, Royster & Wright, Elmsford, NY, on the brief), for Defendant–Appellee.

Before: OAKES, KEARSE, and JACOBS, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff William J. McLee appeals from a final judgment of the United States District Court for the Southern District of New York, Jed S. Rakoff, *Judge*, dismissing his complaint alleging that defendant Chrysler Corporation ("Chrysler" or the "Company") discriminated against him in the terms and conditions of his employment and terminated his employment on the basis of his race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (1994), and 42 U.S.C. § 1981 (1994). The district court granted Chrysler's motion for summary judgment dismissing the complaint on the grounds that McLee failed to adduce evidence sufficient to make out a *prima facie* case of discrimination and that even assuming a *prima facie* case, McLee failed to present evidence that could show that the Company's reason for terminating his employment was pretextual. On appeal, McLee contends principally that summary judgment was improper because there were genuine issues of fact to be tried as to the reasons for Chrysler's terminating his employment. For the reasons that follow, we disagree and affirm the judgment of dismissal.

## I. BACKGROUND

McLee began to work for Chrysler in February 1992; his employment was terminated in June 1992. The pertinent events, summarized below on the basis of the parties' statements pursuant to Rule 3(g) of the Civil Rules for the Southern District ("Rule 3(g)"), and deposition testimony by McLee, are largely undisputed.

### A. *McLee's Employment With Chrysler*

In early 1992, McLee, a black male, applied to Chrysler for a position as a supervisor in the company's Tappan Parts Depot warehouse facility ("Tappan Depot" or "Depot"). Tappan Depot manager Robert S. Broderdorf, whose responsibilities included personnel decisions such as hiring and firing, interviewed McLee and hired him as night stock supervisor. In that capacity, McLee was to supervise a shift of machine operators whose primary function was to move parts from the Depot's reserve locations to pick-up stations from which other employees could collect them for shipment to Chrysler dealers.

McLee began work on February 3, 1992. His supervisors included warehouse manager Stephen "Skip" Dahlman, warehouse night manager James Garden, and head night supervisor Jeffrey Haas. On March 9, 1992, Garden gave McLee a written 30–day evaluation of his work and met with him to discuss it. Although Garden rated McLee's overall performance "3" on a scale of 1–5, meaning "at requirements," Garden noted that in certain respects McLee's work was not satisfactory.

In early June 1992, after he had been on the job for four months, McLee was given a 120–day review. He received a preliminary written evaluation that was worse than his 30–day evaluation. Of the 22 categories in which his performance was evaluated, he was rated unsatisfactory in 13. On June 4, he met with Garden and Haas, who discussed unsatisfactory areas with him. At that meeting, after they had reviewed the criticisms, McLee stated that he believed Haas had a problem with minorities. McLee had never before communicated such a belief.

On June 5, 1992, McLee met with Garden, Haas, and Broderdorf. Broderdorf asked McLee whether he felt uncomfortable working for either Garden or Haas. McLee responded that he did not. He recanted his June 4 accusation of bias, stated that he did not believe Haas was a racist, and apologized to both Garden and Haas. Broderdorf then reviewed some of the areas in which McLee's performance had been found lacking and asked why McLee had not made any written comments regarding the 120–day evaluation. McLee was then given time to respond in writing to all of the comments in his review which he felt were inaccurate. Broderdorf informed McLee that he would receive a second formal review on June 9 and that thereafter his performance would be evaluated each week for the next month; at the end of the month, Broderdorf would determine McLee's status with Chrysler.

Given the opportunity to challenge the negative evaluations, McLee disputed only six of the 13 areas in which his performance had been rated unsatisfactory. Although in response to the motion for summary judgment McLee asserted that "he did not neces-

sarily dispute all that he in fact disagreed with" (McLee Rule 3(g) Statement ¶ 60), at his deposition, he testified that he had disputed only the criticisms he "felt were not fair" (McLee Dep. 316). On June 9, McLee met with Garden and promised to try to improve his performance.

On the evening of June 9, 1992, hours after that promise, McLee left work early, in pain due to a blister on his small toe. He went to Nyack Hospital, where he was treated by a Dr. Silverberg who issued him a note that stated: "Please excuse [McLee] from work for 24 hours." Hospital personnel also provided McLee with a form entitled "Aftercare Instructions to the Patient," instructing "Keep off foot for 24 hours." McLee called Haas that night and said he was supposed to stay away from work for 48 hours. (McLee Dep. 250 ("I told [Haas] that night that I went to Dr. Silverberg, that I will be supposed to be out forty-eight hours."); id. at 251 ("I said twenty-four to forty-eight hours....").) McLee stayed away from work for two days. On the second day, he received a call from Garden. McLee told Garden that Dr. Silverberg had instructed McLee not to work for 48 hours. Garden told McLee to call Broderdorf the next day.

On the following day, June 12, McLee telephoned Broderdorf, who said he was "in the process of doing all the paperwork" to fire McLee. McLee then telephoned Chrysler's Human Relations office in Detroit, along with the NAACP and other civil rights or labor offices. McLee met with Broderdorf and Dahlman later that day. According to McLee, as described in Part I.B. below, Broderdorf and Dahlman began that meeting by asking McLee whether he had been in touch with those offices; when McLee responded that he had, the conversation assumed a hostile tone. As to McLee's excuse for missing the second day of work, McLee presented his written note from Dr. Silverberg. McLee contends that he attempted to explain that, notwithstanding the note's reference to 24 hours, Dr. Silverberg had instructed him orally to take up to 48 hours off if necessary to allow the infected blister to heal, but that Broderdorf and Dahlman gave him no chance to comment. Chrysler contends that when

asked about the discrepancy, McLee refused to comment. On the next business day, June 15, McLee was fired.

## B. *The Litigation*

After filing a complaint with the Equal Employment Opportunity Commission ("EEOC") and eventually receiving a right-to-sue letter, McLee commenced the present action, alleging principally that Chrysler had terminated his employment on the basis of his race, in violation of Title VII and § 1981. Following a period of discovery, Chrysler moved for summary judgment, contending that McLee could not show that his employment had been terminated because of any racial motivation rather than because of his unsatisfactory performance. The motion was supported by, *inter alia,* affidavits of Broderdorf and Garden and portions of McLee's deposition.

In opposing summary judgment dismissing the claim of discriminatory termination, McLee argued principally that he had been dismissed because he had contacted civil rights groups to protest discriminatory treatment. Thus, McLee submitted an affidavit he had filed in connection with his EEOC complaint, which stated that on June 12, 1992, he had "contacted [Chrysler]'s EEO office in Detroit and left a message. Following this, I met with Broderdorf and Skip Dahlman, Warehouse Manager.... I was told they would review the facts of the matter in light of my contacting EEO in Detroit. On June 15 I was informed by Bob Broderdorf that I was terminated." (Affidavit of William McLee dated August 21, 1992, at 2.) At his deposition, McLee described the start of his June 12 meeting with Broderdorf as follows:

I walked in and they asked if I had called the NAACP and a couple of other people, Howard Stein, the Labor Board, and a couple of other places, and I stated yes.

At the time Skip and Bob took out a piece of paper and said, "This conversation must be documented," and then asked me a series of questions. I remember Skip leaving the room a couple of times. I

remember—I recall it was a very hostile environment.

(McLee Dep. 292.)

McLee also asserted that some time earlier, Haas had been accused of directing a racial epithet at a black hourly employee. McLee stated that he had learned of that accusation because Haas told him of it, with a smile. McLee acknowledged that the Company informed him that the accusation had been thoroughly investigated and found baseless. McLee did not present any evidence of racial slurs or incidents involving McLee himself. McLee admitted that Broderdorf made the decision to fire him and did not consult Haas about whether to do so.

In a Memorandum Opinion and Order dated May 28, 1996 ("Opinion"), the district court granted the Company's motion for summary judgment. The court ruled principally that, "[d]espite full discovery, ... plaintiff has failed to adduce evidence sufficient to make the minimal *prima facie* showing of discrimination necessary to survive a motion for summary judgment," Opinion at 2, primarily because "he utterly fail[ed] to show that he performed his job in a satisfactory manner," *id.* at 4.

For example, confronted with both documentary and testimonial evidence that he was repeatedly late for work and was warned about his excessive tardiness by his supervisors ... McLee admitted at his deposition to being late on a number of occasions ... and to being warned by his supervisors more than once that such tardiness was unsatisfactory on the part of a supervisory employee.... Yet it was only after being warned about this and other serious inadequacies in his performance that McLee, for the first time, suggested that one of his supervisors, Jeffrey Haas, had a problem with minorities—an allegation he subsequently withdrew after admitting it was made only because of his anger over the criticism of his job performance.... His further response to repeated warnings of inadequacy was to absent himself entirely from work for two days on the basis of a blister on his foot, despite being advised in writing by his doctor, following an examination, that he

need only take one day off.... It was only after this last incident that Chrysler finally terminated him....

In addition to chronic tardiness, McLee's 120–day evaluation listed eleven other areas of unsatisfactory performance (out of a total of 23 areas), including, *inter alia*, failing to complete assignments on time, failing to complete projects at an acceptable level, failing properly to supervise employees, and failing to solve operational problems. When given the opportunity to contest the twelve particular respects in which his evaluations were below the satisfactory level, McLee chose to contest only six of the twelve.... In addition, he chose not to contest his overall performance rating of "Below Requirements".... When asked about this at his deposition, he admitted that he had only contested the evaluations that he thought were unfair....

Thus, by McLee's own repeated admission, his job performance was unsatisfactory both in numerous particulars and overall. While the *prima facie* showing required of a plaintiff in an employment discrimination lawsuit is a very modest one, Chrysler's undisputed evidence of plaintiff's substandard job performance, confirmed by plaintiff's own admissions, preclude his carrying even so minimal a burden.

*Id.* at 5–6. The court also found the record insufficient to establish a *prima facie* case on the claims that McLee had been discriminated against in salary, fringe benefits, or training.

Judgment was entered dismissing the complaint in its entirety, and this appeal followed.

## II. DISCUSSION

On appeal, McLee contends that the district court erred in granting summary judgment dismissing his claim of discriminatory termination because there were genuine issues of material fact to be tried. Though McLee's brief also mentions his allegations that he was the victim of discrimination in some of the terms and conditions of his employment, those allegations are briefly adverted to only in the course of his argument that dismissal of the termination claim was improper. To the extent that McLee challenges the district court's rejection of those other claims, we affirm the dismissal substantially for the reasons stated in the district court's Opinion. We conclude that the termination claim was properly dismissed for the reasons that follow.

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *See* Fed. R.Civ.P. 56(c). The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989).

In order to establish a *prima facie* case of discriminatory discharge in violation of Title VII or § 1981, a plaintiff must show (1) that he belongs to a protected class, (2) that he was performing his duties satisfactorily, (3) that he was discharged, and (4) that his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class. *See, e.g., Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.1995); *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994); *Ramseur v. Chase Manhattan Bank*, 865 F.2d at 464. The burden that an employment discrimination plaintiff must meet in order to defeat summary judgment at the *prima facie* stage is *de minimis. See, e.g., Cronin v. Aetna Life Insurance Co.*, 46 F.3d 196, 203–04 (2d Cir.1995); *Chambers v. TRM Copy Centers Corp.*, 43 F.3d at 37; *Dister v.*

*Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988). Since the court, in deciding a motion for summary judgment, is not to resolve issues of fact, its determination with respect to the circumstances that give rise to an inference of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. *See, e.g., Cronin v. Aetna Life Insurance Co.,* 46 F.3d at 204; *Chambers v. TRM Copy Centers Corp.,* 43 F.3d at 38. (Judge Jacobs is of the view that the Title VII *prima facie* case, which need only be *de minimis* in character, is not always sufficient to support an ultimate inference of discriminatory motive, and he disagrees with the foregoing sentence of text to the extent that it can be read to say so.) Though caution must be exercised in granting summary judgment where motive is genuinely in issue, *see, e.g., Gallo v. Prudential Residential Services, Limited Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994), summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact, *see, e.g., Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 19 (2d Cir.1995); *McLee v. Chrysler Corp.,* 38 F.3d 67, 68 (2d Cir.1994); *Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir.1994). In the present case, the district court properly found that McLee had failed to meet even his *de minimis* burden with respect to at least two of the elements of his claim, to wit, satisfactory performance, and circumstances that could permit an inference of discriminatory motivation.

 To begin with, the record, including McLee's own admissions and assertions, establishes indisputably that, for race-neutral reasons, McLee's performance was not satisfactory. Our review of the record shows that in his 120–day review in early June, McLee was found to be deficient in 13 of the 22 areas in which he was rated. The deficiencies included tardiness in arriving at work, failure to submit audits and other paperwork on time, inaccuracy in his workload management data, inadequate written and oral communication, and inability to solve operational problems. When invited by his supervisors to comment, McLee did not dispute even half of the negative evaluations. In his deposition, McLee stated that he had disputed only those evaluations that he thought were not fair; thus, there is no genuine dispute that, as to nearly one-third of the rated areas, McLee's performance was found unsatisfactory and that those evaluations were fair. Further, in response to the summary judgment motion, some of McLee's Rule 3(g) disputations were rationalizations for his deficiencies rather than demonstrations of any genuine issue of material fact to be tried. For example, McLee was criticized for being late in arriving for work on a number of occasions. While he attempted to deny that he was tardy, he also attributed his tardiness to his car purchase efforts and to Company policy that prohibited him from parking in a lot that was nearer the warehouse if he drove a non-Chrysler car. McLee's explanations, even if true, in fact confirmed the validity of the tardiness criticisms.

Further, though McLee disputes that he had any attitudinal problems, some of his explanations plainly reveal such problems. For example, Chrysler alleged that in the 120–day evaluation on June 9, McLee promised to try to improve his performance. In his Rule 3(g) Statement, McLee disputed this by saying that he did not agree to try to make his performance any better than it had been in the first 30 days of his employment at Chrysler. Yet in that earlier period, although his performance was rated as "at requirements" overall, it is undisputed that in some areas he had been judged deficient. We conclude that the record as a whole, including many of McLee's own statements, taken in the light most favorable to McLee as the party opposing summary judgment, establishes that his performance was unsatisfactory.

McLee argues that a rational juror could permissibly infer (a) that his performance was not sufficiently unsatisfactory to lead to the termination of his employment on June 15 because the Company had said he would have 30 days from June 9 in which to improve, and (b) that that 30–day period was cut short because the Company, upon learning on June 12 that McLee had contacted civil rights groups, decided to fire McLee on

the next business day. He argues that from these inferences, the jury could find that the Company's decision was motivated by racial animus or impermissible retaliation.

Such a sequence of events might, in some circumstances, be sufficient to create a triable issue of fact precluding summary judgment. In the present case, however, the inferences urged by McLee are foreclosed by facts he does not dispute. First, there was no guarantee that McLee would have 30 days from June 9 in which to improve. Though he was told that he should try to improve over the next 30 days, he admits that he was also told that his performance would be evaluated each week. Further, though not disputing many of the negative evaluations, McLee, according to his own Rule 3(g) Statement, did not even promise on June 9 to try to bring all aspects of his performance up to a satisfactory level. Moreover, immediately after those evaluations, McLee absented himself from work for the next two days. He was fired after he presented a documentary medical excuse that was contrary to his representations to the Company as to the extent of his doctor's recommendation. No rational trier of fact could infer a discriminatory motivation from this sequence.

■ Second, McLee's effort to provide evidence of such motivation by suggesting that he was fired on June 15 because his supervisors learned on June 12 of his contacts with civil rights offices fails in light of his own deposition testimony. According to McLee's testimony, the reason he called the civil rights offices was precisely because Broderdorf had just told him that he would be fired. McLee learned of that decision when he called Broderdorf on June 12, as instructed by Garden on June 11:

Q. Mr. McLee, you stated earlier, I believe, that Jim Garden told you to call Bob Broderdorf the following day; is that correct?

A. Yes.

Q. Did you call Bob Broderdorf the next day?

A. Yes.

Q. Do you remember what Bob Broderdorf told you?

A. "I'm not happy. I'm in the process of doing all the paperwork to throw you out in the street."

Q. Those were his exact words?

A. Yes.

(McLee Dep. 263.) It was only after thus learning that he was to be fired that McLee called the Chrysler Human Relations office, the Labor Board, and the NAACP, to report his conversation with Broderdorf:

Q. What did you say to [Chrysler employee] Stein?

A. I told him that Bob Broderdorf stated on the phone when I talked to him that he was in the process of filling out paperwork that would throw me out in the street, and I feel that there is a case of unjust discrimination going on and I feel I am going to be terminated or whatever.

(McLee Dep. 294.)

Q. What did you tell [the Labor Board] as far as what had happened?

A. I stated—I remember talking about the two days where I had the affected [*sic*] toe, my blister, and I remember talking about that Bob said he is going to throw me out in the street. I remember talking about those things.

(McLee Dep. 296–97 ("[*sic* ]" in original); *see also id.* at 297–98 (McLee also so informed someone at the NAACP office; that was the first time he had called the NAACP).) Since by McLee's own testimony Broderdorf was preparing to discharge McLee before McLee contacted any of the civil rights offices, it is not a permissible inference that McLee was discharged because he contacted those offices.

Further, although on June 4, McLee accused Haas of having a problem with minorities, McLee expressly retracted that accusation on June 5 and said he did not believe Haas had such a problem. On June 12, McLee did another 180° turn and said that he did in fact believe that Haas had a problem with minorities, directly contradicting his June 5 statement to Broderdorf. But the June 12 accusation, like the complaints to the civil rights offices, was made only after McLee had been told that Broderdorf was

preparing the paperwork for McLee's discharge.

When McLee was asked on June 12 upon what evidence he based his reinstated belief of Haas's bias, he referred to the old, previously discredited allegation that Haas had used a racial epithet with respect to a black hourly employee, and added that he had seen Haas spit on the chairs of minority employees. McLee claimed that he had at his home some records of racial animus; Broderdorf asked him to bring them in, but McLee did not do so. In any event, it is undisputed that Broderdorf, the very person who had hired McLee, made the decision to fire him, and McLee has conceded that Haas was not consulted about that decision. Claims of Haas's bias, asserted by McLee upon learning he was to be discharged, provide no basis for imputing to Broderdorf an invidious motivation for the discharge.

In sum, the record forecloses any inference that McLee's job performance was satisfactory, and given the sequence of events that McLee himself described or did not dispute, there is no evidence in the record from which it could rationally be inferred that McLee's allegations of discrimination, whether to civil rights offices or to his supervisors, played any part in Broderdorf's decision to fire McLee.

## CONCLUSION

We have considered all of McLee's arguments on this appeal and have found in them no basis for reversal. The judgment dismissing the complaint is affirmed.