Jose CARTAGENA, Plaintiff,

v.

OGDEN SERVICES CORP., Defendant.

No. 95 Civ. 9279(SS).

United States District Court,
S.D. New York.

March 11, 1998.

Alan J. Weiner, New York City, pro se.

Gilroy Downes Horowitz & Goldstein, New York City, for Defendant.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiff Jose Cartagena, who is of Puerto Rican descent, has filed this suit alleging that his former employer, Ogden Services Corporation ("Ogden"), discharged him because of his national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, and the New York Human Rights Law,

**460**

N.Y.Exec.Law § 291 et seq. To support his discrimination claims, plaintiff relies primarily upon an alleged series of national origin epithets made by his supervisor in the months preceding the discharge in early 1995. For its part, Ogden asserts that these remarks were never made and that Cartagena's national Original played no role in the discharge. Rather, Ogden asserts, Cartagena was fired because his work performance had declined and because he was unwilling to change shifts as requested by his supervisor. Following discovery, the defendant has moved for summary judgment. For the reasons to be discussed, the Court denies the defendant's motion.

### BACKGROUND

The following are the facts which, based on the supporting documentation presented, could be found by a reasonable jury. Plaintiff Cartagena began working for Ogden in 1986. Ogden hired Cartagena as a console operator in the Management Information Services (MIS) department; his duties involved technical support and operation of the mainframe computer systems used by the MIS department to perform various tasks, such as collection and distribution of financial data, printing of checks, and handling of various wire transfer activities for other divisions and corporations within Ogden.

Edward Lehigh supervised Cartagena for most Of his employment period. Lehigh originally hired Cartagena and was originally pleased with Cartagena's performance. Lehigh gave Cartagena at least two pay raises during Cartagena's tenure with Ogden and promoted him to console shift supervisor in 1989. Lehigh was pleased with Cartagena's performance until problems began in late 1993.

In or around late 1993, Cartagena began to have problems at home, the details of which need not be recounted here. Suffice it to say that, even according to Cartagena, his personal problems began to distract him at work, to the point that by mid–1994 on occasion Cartagena would incorrectly run computer jobs, creating the need for reruns; these errors Occurred two to three times a

week. About once a week, one of these reruns carried over into the next shift. Lehigh noted a decline in performance, although there is a dispute over whether Cartagena was responsible for a number of the errors cited by Lehigh.

Also in early 1994, Lehigh asked the plaintiff to move from the first shift (8:00 a.m. – 4:00 p.m.) to the second (4:00 p.m. – 12:00 midnight). Apparently, different shifts were responsible for different types of activities, and according to Lehigh, this move was requested in order to allow another employee, James Theodakis, to learn the jobs that were performed on the first shift. According to the defendant, the transfer was to be for only six months or so, until Theodakis learned the first shift jobs. Cartagena had been told upon his hiring that he might be required to change shifts and had done so at other points in his career with Ogden. Cartagena, however, resisted this shift change on the grounds that his wife's schedule made it difficult for him to work at Other times and also that his neighborhood would be an unsafe place in which to walk to and from transportation that late at night. Lehigh agreed to postpone the shift change on two or three occasions, but by June 1994 Lehigh told Cartagena on at least one, possibly two, occasions that his unwillingness to change shifts was placing his job in jeopardy. From August 1994 until his termination in January 1995, however, no further demands for shift changes were made upon the plaintiff.

In June 1994, Lehigh came into the computer room and found that a particular job had not been run correctly; according to Cartagena, the failure had been due to a previous shift's error. Turning to Cartagena, Lehigh allegedly said, "You fucking Puerto Rican can't do the job right." Cartagena asserts that this comment, or One very similar, was repeated in a similar occasion in August 1994. In addition, in November 1994, following a run error which Cartagena claimed was due to incomplete input from outside the department, Lehigh allegedly said "You fucking Puerto Rican can go get them." Lehigh denies ever making these statements.[1]

---

**1.** Cartagena also claims that on a number of occasions Lehigh told him and his coworkers,

"You fucking guys can't do the job right," and characterized these as racial slurs. Although on

On January 12, 1995, Ogden fired Cartagena, ostensibly for his refusal to change shifts and his declining work performance. Ogden has submitted evidence that Cartagena's position was not backfilled, and Cartagena has alleged otherwise but presented no evidence to that effect. On this point Cartagena has failed to raise a triable issue of fact; the significance of this failure, however, will be discussed below. Cartagena filed this suit on October 31, 1995, alleging that Ogden fired him on account of his national origin—i.e., because he is Puerto Rican Before the Court is the defendant's motion for summary judgment.

### DISCUSSION

■ Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of identifying the evidence that it believes demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether summary judgment is appropriate, the Court resolves all ambiguities and draws all reasonable inferences against the moving party. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997). The Second Circuit has also cautioned that courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof

which, if believed, would show discrimination.'" *Id.* at I 10 (quoting *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994)).

In Order to prevail, a Title VII plaintiff claiming discriminatory discharge must prove that he or she was the victim of intentional discrimination—i.e., that his or her employer discharged the plaintiff "because of [the plaintiff's] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).[2] It is undisputed that Ogden fired Cartagena. What is in dispute, as it is in most Title VII cases, is whether Cartagena was fired because of an impermissible factor—here, his national origin.

Title VII cases can be divided into two types of cases, sometimes called "pretext" and "mixed-motive" cases but more recently called by the Second Circuit "single issue motivation" and "dual issue motivation" cases. *See Fields v. New York State Office of Mental Retardation & Developmental Disabilities,* 115 F.3d 116, 119–20 (2d Cir. 1997). As explained in *Fields,* in single issue cases, "the fact-finder must decide only the single issue of whether an impermissible reason motivated the adverse action," while in dual issue cases "the fact finder must decide both the issue of whether the plaintiff has proved that an impermissible reason motivated the adverse action and the additional issue of whether the defendant has proved that it would have taken the same action for a permissible reason." *Fields,* 115 F.3d at 119–20. The "substantial motivation" question in dual issue cases is the same as in single issue cases. *See id.* at 124 n. 4.

One means by which a plaintiff may meet his or her burden in a single issue case is through the familiar burden-shifting process of *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *McDonnell Douglas*

its face this statement does not appear to be racial, it is not inherently implausible to think that, given the comment's similarity to the alleged anti-Puerto Rican remarks, a reasonable observer in Cartagena's position might have viewed them as part of a pattern of racially tinged remarks. The Court need not decide this, however, because these additional remarks do not significantly add to the quantum of evidence Cartagena has put forward.

2. As far as concerns this case, the substantive standards governing Title VII cases are the same as for claims brought under 42 U.S.C. § 1981, *see McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir.1997), and the New York Human Rights Law, *see Song v. Ives,* 957 F.2d 1041, 1046 (2d Cir.1992).

*Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, a plaintiff first establishes a prima facie case by establishing (in a discriminatory discharge case such as this one) that (1) he or she is a member of a protected class, (2) he or she was qualified for his job, (3) he or she was discharged, either actually or constructively, and (4) the discharge took place under circumstances that give rise to an inference or discrimination (typically, by establishing that the position either remained open or was backfilled by someone from outside the protected class). *See Stern v. Trustees of Columbia University,* 131 F.3d 305, 311–12 (2d Cir.1997); *Sergio de la Cruz v. New York City Human Resources Admin.,* 82 F.3d 16, 20 (2d Cir.1996).

■■■ Establishment of a *McDonnell Douglas* prima facie case serves one, and only one, purpose: to shift to the defendant the burden of producing evidence of a legitimate, nondiscriminatory reason for the termination. *See Fisher,* 114 F.3d at 1336–37. Upon articulation of this legitimate reason, the inference of discrimination raised by the prima facie case is dispelled, and the plaintiff is left with the ultimate burden of proving that an impermissible reason was a motivating factor in the termination. *See id.* Although evidence showing that the proffered nondiscriminatory reason is pretextual may be probative to this ultimate burden, proof of pretext is neither necessary, *see Renz v. Grey Advertising,* 135 F.3d 217, 222 (2d Cir. 1997); *Fields,* 115 F.3d at 121, nor sufficient to establish liability. *See Fisher,* 114 F.3d at 1339.

Alternatively, a plaintiff may meet his or her burden, not by the *McDonnell Douglas* framework, but rather through direct evidence. "Direct evidence" of discrimination is something of a misnomer, in that any evidence short of a bald statement by the decisionmaker to the effect that they are firing an employee for an impermissible reason requires *some* inferential step to support a finding of discriminatory motive. *See Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 181–82 (2d Cir.1992); *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1185 (2d Cir.1992). Rather, the term is used to distinguish direct evidence from the kind of evidence which makes out a *McDonnell Doug-*

*las* prima facie case—i.e., evidence from which an inference of discrimination arises only because "it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection," *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094, and which inference is therefore immediately dispelled once the employer has produced evidence of a nondiscriminatory reason. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *Fisher,* 114 F.3d at 1337.

While not purporting to create an exhaustive list of what can constitute direct evidence, the Second Circuit in *Ostrowski* discussed in general terms what could and could not constitute direct evidence, in the context of what evidence would support a "mixed-motive" jury charge:

> Purely statistical evidence would not warrant such a charge; nor would evidence merely of the plaintiff's qualification for and the availability of a given position; nor would "stray" remarks in the workplace by persons who are not involved in the pertinent decisionmaking process. . . . If, however, plaintiff's nonstatistical evidence is directly tied to the forbidden animus, for example policy documents or statements of a person involved in the decisionmaking process that reflect a discriminatory or retaliatory animus of the type complained of in the suit, that plaintiff is entitled to a burden-shifting instruction.

*Ostrowski,* 968 F.2d at 182. Although of course this Court is deciding a motion for summary judgment, not a motion for a mixed-motive jury charge, the Second Circuit has cited approvingly the use of the *Ostrowski* formulation in the summary judgment context as well. *See Raskin v. Wyatt Co.,* 125 F.3d 55, 60–61 (2d Cir.1997).

Regardless of the type of case, however, the question for the Court on a motion for summary judgment is whether plaintiff has produced sufficient evidence "to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia University,* 131 F.3d 305, 312 (2d Cir.1997). The plaintiff may meet this burden through any combination of direct and circumstantial evidence. *See Ostrowski,* 968 F.2d at 181–82.

The parties spill a considerable amount of ink over the issue of whether Cartagena has made out a *McDonnell Douglas* prima facie case. Ogden asserts that Cartagena must prove that his position was backfilled with a non-Puerto Rican employee; Cartagena disputes that this is a necessary element of his case and also asserts that the fact that James Theodakis, the man whom Ogden desired to move onto the first shift, was not Puerto Rican gives rise to a sufficient inference of discrimination to satisfy the fourth element. The Court need not resolve this dispute, however.

To begin with, the Second Circuit has made it clear that, in order to make out a *McDonnell Douglas* prima facie case of discriminatory discharge, the plaintiff need not prove either that his position remained unfilled, *see Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir.1996), or that it was backfilled by someone of different (in this case) national origin. *See Meiri v. Dacon*, 759 F.2d 989, 995–96 (2d Cir.1985). It is worthwhile to remember that the elements of a *McDonnell Douglas* prima facie case are *not* the elements which ultimately must be proven by the plaintiff, they are merely one way of raising an inference of discrimination which forces the defendant to dispel that inference by producing evidence of a legitimate, nondiscriminatory reason for the discharge.

Second, Cartagena's inference of discrimination in this case arises not indirectly, through a *McDonnell Douglas* framework, but rather directly from Lehigh's alleged comments. Lehigh's comments to Cartagena, if made, are the kind of remarks by a decisionmaker reflecting discriminatory animus contemplated in *Ostrowski*. They are certainly not "stray remarks"—these remarks were allegedly directed at the plaintiff in connection with a criticism of his work skills, during the time period immediately prior to plaintiffs discharge. If said, a reasonable jury could believe that these remarks

*"directly reflect[]* the alleged discriminatory attitude," *Raskin,* 125 F.3d at 60–61 (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir.1997)), on the part of the man who admittedly made the decision to fire Cartagena.

The close nexus between the statements and the discriminatory act complained of distinguishes Cartagena's complaint from the Second Circuit cases relied on by defendant. In the closest case, *Woroski v. Nashua Corp.*, 31 F.3d 105 (2d Cir.1994), the Second Circuit upheld a grant of summary judgment to the defendant on a complaint filed under the Age Discrimination in Employment Act (ADEA) despite the fact that the plaintiff had produced evidence that the decisionmaker in that case had made remarks such as "what this company needed was new younger people" and the "salary work force was older and had been around too long." *Id.* at 108. As noted by the *Woroski* Court, however, the remarks were not made to the plaintiffs, *see id.* at 110, and were more general statements of animus that had no direct connection to the employment decisions at issue. Similarly, in *Renz*, there were some statements allegedly made by the decisionmaker commenting critically on the ages of some of the employees, but again no evidence of remarks directed at the plaintiff or in connection with her discharge. *See Renz,* 135 F.3d at 224. Lehigh's statements, in contrast, were made to Cartagena while critiquing his work performance, and if made they suggest that Lehigh viewed Cartagena's work performance to be unacceptable because *Cartagena* is Puerto Rican, not merely a vague animus towards Puerto Ricans in general. Finally, in *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189–90 (2d Cir.1987), cited by defendant in its reply brief, the Second Circuit only held that the racial remarks directed to the plaintiff by his supervisor were insufficient to establish a racially hostile work environment, not that they would be insufficient to establish a discriminatory motivation for discharge.[3]

---

**3.** Defendant's citations to case law from other circuits is similarly unavailing, and not merely because they are not binding precedent on this Court. As in *Lopez,* in *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir.1981), the language cited by the defendant ("We find no steady barrage of opprobrious racial com-

ment.... Racial comments that are merely part of casual conversation, are accidental, or are sporadic do not trigger Title VII's sanctions") comes from the Eighth Circuit's rejection of a claim that the workplace was so infused with racial slurs as to *itself* constitute a racially hostile

█ The defendant also claims that it is clear from the record that it had sufficient reason to fire Cartagena—namely, his declining work performance and his refusal to change shifts. Although the Court notes that these are very much issues in dispute in the this case, the Court does not deny that there is ample evidence in the record from which a jury could so find, and were this Court deciding the *plaintiff's* motion for summary judgment it would have to be denied on that basis. However, plaintiff need not prove that discriminatory animus was the *sole* or even *principal* reason for his discharge, only that it was a motivating factor— *i.e.,* that it played apart. *See Raskin,* 125 F.3d at 55; *Renz,* 135 F.3d at 224. This likewise means that the plaintiff need not prove "but for" causation—i.e., that but for the discriminatory motive, the plaintiff would not have been discharged. Rather the burden of *disproving* but-for causation—i.e., the burden to show that the plaintiff would have been discharged regardless of the presence of any discriminatory animus—falls to the defendant if the plaintiff is able to show that a discriminatory motive was a factor (and then only as a means of limiting the available remedies, not to avoid liability). *See* 42 U.S.C. § 2000e–5(g)(2)(B); *Fields,* 115 F.3d at 123.

█ The Court cannot say that a jury, upon a finding that Lehigh made the remarks alleged, would be behaving unreasonably were it to conclude that Lehigh fired Cartagena at least in part because he is Puerto Rican. Cartagena's admitted problems at work, read (as the Court must on a motion for summary judgment) in the light most favorably to his case, were not so egregious (as shown by the defendant's very delays in repeating the shift demands and in tolerating the work errors) that it would be impossible to conclude that the defendant would not have tolerated them from any employee regardless of their national origin. *Compare Fields,* 115 F.3d at 122 n. 2 (where defendant established that plaintiff had embezzled funds, it would be unreasonable for factfinder to conclude that age discrimination also played a role, because "the evidence would be unlikely to permit a reasonable finding that the employer was determined to discharge only elderly embezzlers"). In light of Lehigh's remarks, a reasonable factfinder could conclude that Ogden was less tolerant of Cartagena's problems, or that Lehigh viewed Cartagena's problems more severely, because he is Puerto Rican.[4]

Of course, Cartagena will bear the burden of proving this at trial, and Ogden is free to dispute (1) whether Lehigh made the remarks at all; (2) if he did, whether they reflected any actual animus on Lehigh's part against Puerto Ricans or whether they were, perhaps, comments made in a state of agitation; and (3) even if Lehigh did harbor animus toward Cartagena because of his national origin, whether he allowed this animus to play a role in the decision to discharge Cartagena. Finally, of course, if a jury found that anti-Puerto Rican animus played a part in the decision, Ogden would also be free to prove that Cartagena's other problems would have led to his firing regardless. If believed, however, this would not entitle Ogden to a

---

work environment in violation of Title VII; the *Johnson* court was not addressing the question of when racial comments could constitute evidence of discriminatory *motive* for an adverse employment action. Precisely the same analysis applies to *Cariddi v. Kansas City Chiefs Football Club, Inc.,* 568 F.2d 87, 88 (8th Cir.1977).

In *Stallcop v. Kaiser Foundation Hospitals,* 820 F.2d 1044 (9th Cir.1987), the sole remark made to the plaintiff was by a supervisor who said that the plaintiff "did not 'know the English language.'" Id. at 1050. This single remark, which did not directly reflect animus on the basis of national origin, made no connection between the plaintiff's ethnicity and her job performance and came "a year or two" prior to the termination, unlike the three very pointed remarks allegedly made by Lehigh in the six months prior to Cart-

agena's termination. Finally, in *Hong v. Children's Memorial Hospital,* 993 F.2d 1257 (7th Cir.1993), the discriminatory remark at issue— "learn to speak English"—was not said by the persons who made the decision to fire the plaintiff.

**4.** The Court notes that, although the defendant claims that two employees under Cartagena's supervision were fired on Cartagena's recommendation for work errors of the same magnitude as Cartagena's, there is considerable dispute in the record on this point. Cartagena asserts, for instance, that one of the two employees was constantly late and had a drinking problem. It is simply not clear that Cartagena's errors, assessing the evidence most favorably to Cartagena, were as severe. This issue remains one for a jury to decide.

verdict in its favor but would limit the remedies to injunctive and declaratory relief and attorneys' fees.

### CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is denied. The parties are directed to be trial-ready on 48 hours' notice any time after April 20, 1998. A pretrial conference will be held on April 28 at 4:30 p.m., unless called earlier by the Court.

The parties are advised to read carefully the Court's rules on pre-trial submissions, trial preparation and conduct. The plaintiff is directed to deliver a draft of the Joint Pretrial Order, Proposed Voir Dire, Proposed Jury Charge, and Memorandum of Law on disputed legal issues to the defendant by March 27. Defendant's reply and counter-proposals are due to the plaintiff by April 10. The consolidated version of these submissions are due to the Court by April 17. The plaintiff is also directed to send a representative to chambers immediately with a 3.5″ disk to receive a copy of the Court's standard pretrial order form, standard jury charge, and voir dire.

**SO ORDERED.**