Steven BRADY, Anthony Laster, Angelo F. Dallas, Curtis J. Frost, and Mark Franklin, Plaintiffs,

v.

KBI SECURITY SERVICE, INC. and Robert King, Defendants.

Nos. 95 CV 3686, 95 CV 5255, 95 CV 5230, 95 CV 5214, 96 CV 2194.

United States District Court, E.D. New York.

March 27, 2000.

Michael B. Sena, Silbert & Sena, LLP, New York City, for plaintiffs.

Clifford J. Ingber, Ingber & Ingber, New York City, for defendants KBI Security Service, Inc. and Robert King.

Anita Lubetsky, New York City, for defendants KBI Security Service, Inc. and Robert King.

Elliott Schnapp, Gordon Gordon & Schnapp, New York City, for defendant KBI Security Service, Inc.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiffs Steven Brady, Anthony Laster, Angelo F. Dallas, Curtis J. Frost, and Mark Franklin bring this consolidated civil rights suit against defendants KBI Security Service, Inc. ("KBI") and Robert King, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York Executive Law § 296, and Title 8 of the Administrative Code of the City of New York. Plaintiffs allege that the defendants created a racially hostile work environment, that they were terminated because of their race, and that they were terminated in retaliation for protected activity. Defendants move for summary judgment under Federal Rule of Civil Procedure 56.

## I

The record, in substance, shows the following.

Defendant KBI is a security agency licensed to offer security services in New York. Plaintiffs were each employed with KBI approximately between the years 1989 and 1995 as security guards and were assigned to work at Lindsay Park Apartments ("Lindsay Park"), an apartment complex comprised of over two thousand cooperative apartments in Brooklyn, New York. KBI contracted with Lindsay Park to provide an unarmed security force of approximately 40 security guards to patrol and protect the complex on a 24–hour basis.

According to defendants, security guards employed by KBI are subject to "strict regulations regarding the chain of command, uniforms and appearance, tardiness and attendance, and conduct while on duty," and KBI operates like a "para-military organization." The commanding officer of the security force at Lindsay Park was Inspector Robert Foglia ("Foglia"). He had the "ultimate authority to assign, transfer, discipline and terminate Lindsay Park security guards," but was not involved in any hiring decisions. Defendant Robert King is the president and sole shareholder of KBI.

According to the plaintiffs, the defendants harassed them in retaliation for filing claims with the New York State Labor Relations Board ("Labor Board") for denial of pay and benefits owed them under the collective bargaining agreement with their union and on account of their African–American race. They claim that these were also the reasons for their termination.

According to the defendants, each of the plaintiffs was fired for continuing disciplinary violations, not for race or for filing

claims with the Labor Board. Defendants point out that between 1993 and 1995, 30 of the security guards at Lindsay Park were black, 4 were Hispanic, and 2 were white. In addition, each of the plaintiffs was replaced by an African–American.

At various times either before or after their terminations, each plaintiff filed charges with the United States Equal Employment Opportunity Commission ("Equal Employment Commission"), alleging the defendants had racially discriminated against them. They each also filed grievances with the Labor Board to challenge their terminations. The Labor Board denied all of their grievances, finding in substance that KBI had discharged them for just cause. The Equal Employment Commission denied the complaints of Brady, Laster, and Franklin, finding in substance that KBI did not discriminate against them on the basis of national origin or race. The parties do not provide further information as to the disposition of Dallas's and Frost's charges with the Equal Employment Commission.

## II

Under Rule 56 of the Federal Rules of Civil Procedure, the moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The substantive law governing the case will determine those facts that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is warranted only if "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Id.*

Moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III

Plaintiff's amended complaint makes three claims: that defendants (1) created a racially hostile work environment; (2) terminated them at least in part because of their race or national origin; and (3) terminated them in retaliation for performing activities protected under Title VII and state law.

Plaintiffs' claims under New York State and New York City law will be analyzed under the law of Title VII, whose standards New York courts have adopted for the adjudication of civil rights claims brought under the New York Executive Law and Title 8 of the Administrative Code of New York City. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565, n. 1 (2d Cir.2000); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1177 (2d Cir.1996).

### Hostile Work Environment

■ To state a claim for a racially hostile work environment under Title VII, a plaintiff must demonstrate " '(1) that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer.' " *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986)).

■ According to the Supreme Court, to determine whether an environment is "hostile" or "abusive" requires the court to "look[ ] at all the circumstances." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22,

114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). " '[M]ere utterance of an ... epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII.' " *Id.* at 21, 114 S.Ct. at 370 (quoting *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405–06). There must be " 'more than a few isolated incidents of racial enmity.' " *Schwapp,* 118 F.3d at 110 (quoting *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986)). There must be a " 'steady barrage of opprobrious racial comments,' " *id.* (quoting *Bolden v. PRC, Inc.,* 43 F.3d 545, 551 (10th Cir.1994)), severe and pervasive enough "to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive,' " *id.* (quoting *Harris,* 510 U.S. at 22, 114 S.Ct. at 371).

■ In light of these principles, the evidence does not support the conclusion that the plaintiffs' workplace was "permeated with discriminatory intimidation ... sufficiently severe or pervasive to alter" their work conditions. At most, plaintiffs' affidavits show that isolated racial incidents occurred and that defendants may have sought to harass the plaintiffs in retaliation for filing claims with the Labor Board.

Over the course of several years of employment, plaintiffs can point only to three specific instances where racial epithets were used. Franklin states: "I recall Robert Foglia pointing his gun at me and others and making derogatory comments about the security officers calling them black lackeys." Franklin states that after his termination he returned to Lindsay Park on December 8, 1994, to visit some friends, whereupon Foglia approached him in the lobby and called him a "nigger," "scumbag," and a "piece of shit." Brady states in his affidavit that Captain Barrera, his direct supervisor, who is also black, told him on one occasion to "get my black ass to work."

In addition to these, plaintiffs point to several other instances of inappropriate behavior. Laster claims in his affidavit that Captain Barrera sent him home without pay for failing to answer his radio, "[e]ven though I had answered his call." Laster says that Barrera did this because Barrera "was a Panamanian black and he had a personal dislike for American blacks." On another occasion, Laster says Barrera "was in the back office and got a big dildo and pointed it in the direction of Mr. Brady and told him to perform oral sex on it right there" while he and Dallas were in the room. Brady in his affidavit also says of Barrera that "on numerous occasions" Barrera called him offensive names including "mother-fucker."

If all of the plaintiffs' statements are true, the most they reveal about the defendants is that they have hired some despicable persons. But it hardly follows that defendants created a hostile work environment permeated with severe and pervasive racial discrimination.

The only pervasive factual allegation of all the plaintiffs is that the defendants, through their supervisors, harassed them for filing claims with the Labor Board. Dallas, for example, states in his affidavit that "Captain Barrera and others began harassing me as a result of complaints that I filed (together with the other plaintiffs) relating to the denial of benefits and pay to which we were entitled. Once we filed those charges against the company, the defendants engaged in a conspiracy and concerted action to harass me (as well as the other plaintiffs) ...."

■ Each of the plaintiffs states in substance the same complaint in his affidavit and on this basis makes conclusory allegations that any harassment that occurred after the filing of the claim amounted to "a pattern of discrimination based on race and retaliation for the petition." "However, even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp,* 118 F.3d at 110.

Though plaintiffs may have endured hostility at the hands of their supervisors, the

record shows at most that such hostility was based on non-racial grounds. Race rarely ever entered in as a cause for animosity. As a matter of law the record does not support plaintiffs' claim of a racially hostile work environment. *See Ticali v. Roman Catholic Diocese of Brooklyn,* 41 F.Supp.2d 249, 263 (E.D.N.Y.1999) ("[Defendant] may have harassed, insulted and criticized [plaintiff], but Title VII does not make employers liable for being mean or petty. . . .").

### Discriminatory Discharge

▉▉▉▉ For plaintiffs to state a prima facie case of discriminatory discharge in violation of Title VII, "a plaintiff must show (1) that he belongs to a protected class, (2) that he was performing his duties satisfactorily, (3) that he was discharged, and (4) that his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class." *McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir.1997). The court must determine whether the "proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Id.* at 135. At this stage, a plaintiff's burden is "de minimis." *Id.* at 134.

▉▉▉ A review of the evidence shows that plaintiffs cannot meet even their de minimis burden because they cannot show satisfactory performance of their duties and because the discharges did not occur in circumstances giving rise to an inference of racial discrimination.

According to defendants, Brady received five disciplinary warnings between October 1991 and August 1993 and was fired in October 1994 for one final disciplinary violation. The disciplinary warnings he received were for "reporting to work one hour late"; "for being missing from his post for 15 minutes"; "for departing from his post without authorization, failure to obey orders and insubordination"; for "failure to report to work"; and "for departing from his post without authorization." His last disciplinary warning resulted in a two-day suspension. Then on or about October 17, 1994, Foglia received a written complaint from a Lindsay Park official that Brady "was repeatedly not observed on his post." After Foglia called Brady on his radio he reported to Foglia's office "ten minutes later," whereupon Foglia fired him.

Brady does not dispute that he "was disciplined for various minor infractions." Instead he claims that "none of those incidents were significant nor were they grounds for his dismissal." Furthermore he disputes that he was away from his post. He claims he was on duty checking the parking lot and that Foglia made up "that charge as an excuse to fire [him]."

Brady's rationalizations do not save him from the conclusion that he failed to perform his job satisfactorily. The uncontradicted evidence establishes his poor work habits and performance. In addition, his claim that he was on duty checking the parking lot are flatly contradicted by his admission that his assigned post was the "lobby of Lindsay Park Building No. 2," not the parking lot. There are no genuine issues of fact regarding Brady's discriminatory discharge claim.

According to defendants, Laster was given disciplinary warnings at least five times between January 1993 and April 1994, and was fired on May 6, 1994, for insubordination. The disciplinary warnings he received were for leaving "his post unsecured for ten minutes" and "wearing headphones"; losing the sign-in sheet and refusing to look for it "when asked by his supervisor"; leaving "his post unsecured" on another occasion, being "out of uniform" when found, and becoming "verbally abusive" when confronted; again leaving "his post unsecured"; and failing to "remove his coat and hat from the decorative fence surrounding" the lobby fountain. Laster's supervisors warned him on the last two occasions that he would be terminated if his performance failed to improve.

On May 3, 1994, a member of the Lindsay Park Board of Directors informed Foglia that Laster "had put the latch down on the lobby door of Building No. 5, thereby leaving it open and unlocked." The next day, Foglia instructed Laster not to do this again because "it was unsafe and damaged the door." At this meeting between the two, Foglia observed that Laster's sleeves were rolled up and Foglia told him that he had to roll them down or wear a short sleeve shirt. Later that day, Foglia "again observed Laster with his sleeves rolled up" and this time Laster refused to roll them down. After this instance, Foglia relieved him of duty and told him that "if he wished to continue work for KBI he was required to be interviewed by either the Personnel Director or the President of the company at its headquarters in the Bronx." Laster never reported to the Bronx for the interview and thereafter never returned to work.

Laster does not dispute that he received the above disciplinary warnings, that he left the latch down on the lobby door, that he had his shirt sleeves rolled up, or that he never reported to the Bronx for the interview. Instead he claims that the "disciplinary citations referred to by KBI were offered as a pretext in retaliation for charges filed" by him with the Labor Board. Laster's conclusory assertions do not raise any genuine issues as to his failure to perform his duties satisfactorily, a conclusion amply supported by the record.

According to defendants, Dallas's responsibility was to patrol the parking lots of Lindsay Park and to provide "meal relief," which meant filling in for other guards during their lunch breaks. On October 22, 1994, Foglia "gave Dallas a written warning for repeatedly engaging in unnecessarily long conversations with fellow security guards while on duty." On September 8, 1995, Sergeant Oscar Grandsoult ("Grandsoult"), the supervisor on duty, informed Foglia that Dallas "failed to respond to his radio call, was insubordi-

nate, refused to follow his order to perform meal relief, and made unauthorized transmissions with ... Frost over the radio." Foglia instructed Grandsoult to "send Dallas home." When Grandsoult confronted Frost to relieve him of his duties, "Dallas became verbally abusive." Based on these incidents, Foglia terminated Dallas later that day.

Dallas tells a different version of events. According to Dallas, it was not his duty to perform meal relief on September 8, 1995, but he nevertheless complied with Grandsoult's order after complaining to him that "it was not my job." According to Dallas, Grandsoult "yell[ed] at me" after he complained about the meal relief order. "[Grandsoult] then admitted to [Dallas] that he was told by ... Foglia to harass [Dallas] and that was the reason why he ordered [Dallas] to do the lunch breaks at that time." Dallas then went on the radio and "informed the other security guards" that "Grandsoult received permission from Robert Foglia to harass me." On the radio, Frost suggested to Dallas that he log Grandsoult's admission about Foglia's harassment order in the KBI logbook. Dallas followed Frost's suggestion and logged the entry. Based on these incidents, Foglia fired Dallas that same day.

Even after giving Dallas's factual account the benefit of all favorable inferences, this Court finds he clearly acted in an insubordinate manner and made improper use of company equipment, thereby failing to perform his duties satisfactorily. In addition, the circumstances surrounding his discharge do not give rise to any inferences of discriminatory conduct. Dallas admits as much in his deposition when asked whether he believed his termination resulted from anything besides retaliation for his filing a claim for back pay. Dallas responded: "No, I don't." Without any supporting evidence, his affidavit's conclusory assertions of a racially discriminatory discharge cannot establish a prima facie case.

According to defendants, Frost was terminated on September 8, 1995 for the same reasons as Dallas—"for repeatedly making unauthorized radio transmissions, insubordination, and for attempting to undermine the authority of his supervisors."

Frost does not dispute the events' occurrence. Instead he attempts to rationalize his insubordination by stating that he "was told specifically that we were supposed to record all events that occurred during the course of our shift in the log book." Whatever the evidentiary value of this statement, it is nonetheless clear that the circumstances surrounding his termination do not give rise to any inferences of racial discrimination. Frost admits this in his deposition when he explains his belief that his termination was discriminatory "[b]ecause I filed several complaints against the company" for reasons related to his pay. Without any specific evidence to support his discrimination claim, Frost's statement, together with the uncontradicted facts, show there are no genuine issues of fact regarding the circumstances surrounding his termination.

According to defendants, Franklin "received disciplinary warnings regarding carrying a knapsack to his post, excessive tardiness, and absences." But the pivotal problem with Franklin was that in October 1994, Foglia learned that Franklin had been arrested, found guilty of disorderly conduct in June 1994, and that a bench warrant had been issued for his arrest due to his failure to pay the fine. The company also reviewed his personnel records at the time and found that his INS Form I-9 was incomplete. Because under New York law a criminal record "may prevent the licensing of a security guard" and because of the outstanding questions concerning Franklin's criminal record and employment record, King instructed Franklin in writing on October 19, 1994, to report to KBI headquarters "with two forms of identification" within 24 hours. Defendants say that "Franklin did not report to KBI headquarters until two weeks after he received King's written direction.... Franklin never cleared up the questions about his criminal record and employment record, and never returned to work."

Franklin does not dispute receiving disciplinary warnings for carrying a knapsack to his post and for excessive tardiness and absences. But he does dispute the fairness of the disciplinary warning for the knapsack. He explains that "there were several instances in the past when I brought packages or other materials to work" and that on one occasion Foglia "noticed the bag," inspected the contents, and "told [Franklin] that he had no problem with it." Franklin also seeks to explain his two-week delay in responding to King's request by stating that King's "letter [was] very suspect." He clarifies that "I have been employed by KBI for three years and .... I believe that the defendants requested that I supply [the requested identification documents] to harass me." He also states, with respect to his arrest, that "when I told Robert Foglia about the incident he told me that there was no problem and that it would not affect my employment with the company."

Franklin's rationalizations do not change the fact that he had excessive tardiness and absences, that he waited two weeks before responding to his employer's request, and that a bench warrant had been issued for his arrest. Though Franklin claims that Foglia told him his arrest would not present any employment problems, it is clear from his own affidavit that Franklin was discharged because of the bench warrant and not just the arrest. According to Franklin, "[King] told me that he was aware that there was a warrant out for my arrest .... [and][a]s a result he said I can no longer work for the company." At the minimum, this evidence demonstrates that King had nonracial reasons for discharging him. Together with the other evidence, the record firmly supports the conclusion that Franklin failed to perform his duties satisfactorily.

In addition to the specific evidence relating to each of the plaintiffs' disciplinary and attitudinal problems, this Court takes into account that each of the plaintiffs was replaced by an African–American, the same protected class as plaintiffs. Plaintiffs' assertions of racial discrimination lack force in light of this. It also suggests that if any non-performance-related animosity did motivate their discharges, it stemmed from the management's desire to punish them for filing claims with the Labor Board, and not race. Accordingly, this Court finds as a matter of law that plaintiffs do not have a claim under Title VII for racially discriminatory discharge.

### Retaliatory Discharge

To establish a prima facie case for retaliatory discharge under Title VII, "a plaintiff must show that (1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996).

A "protected activity" under Title VII refers to a person's opposition to "an unlawful employment practice" or a person's assistance or participation in "an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). Title VII defines "an unlawful employment practice," in pertinent part, as an action by an employer

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, ... or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, ... or national origin." 42 U.S.C. § 2000e–2(a).

If the plaintiff can establish a prima facie case of retaliatory discharge, the defendant must then demonstrate legitimate reasons for its actions. *See Kaible v. U.S. Computer Group, Inc.*, 27 F.Supp.2d 373, 378 (E.D.N.Y.1998). If the defendant can meet its burden, the plaintiff must show that the defendant's proffered reasons are a pretext for the true discriminatory motive. *Id.*

The only protected activities for which the defendants can establish a prima facie case are that of Brady's and Laster's. Both filed complaints with the Equal Employment Commission before their terminations, alleging harassment or verbal abuse on the basis of race or national origin. Both experienced adverse employment actions at the hands of KBI. Furthermore, the evidence supports prima facie that a causal connection existed between the protected activities and the adverse actions and that KBI, through its supervisors, was aware of their Equal Employment Commission complaints.

Nevertheless, the evidence amply supports the conclusion that KBI discharged Brady and Laster for non-pretextual, non-racial reasons. Based on Brady's and Laster's affidavits and depositions, they both firmly maintain that they were fired for filing claims relating to pay and benefits owed to them under KBI's agreement with their union. Laster states that "[s]ometime in 1993 or 1994, Captain Barrera ... and my immediate supervisor ... began a pattern of harassment against me based upon charges I filed against KBI relating to my right to a pay increase under our collective bargaining agreement." Brady states that the retaliatory actions began "after I filed a charge against the defendants for back pay ... ultimately resulting in my termination from KBI." But a discharge on the basis of a claim for pay and benefits related to a

union contract is not prohibited by Title VII.

In addition, the evidence also amply supports the conclusion that KBI terminated Brady and Laster for repeated disciplinary and attitudinal problems. As discussed earlier, it is uncontradicted that Brady received numerous disciplinary warnings for reporting to work late and not manning his post properly. At one point, KBI suspended him from work for two days and warned him that continued failure to perform properly would result in his termination. Indeed, the uncontradicted evidence indicates that Brady's termination was probably provoked by his being away from his regular post yet again in October 1994.

Laster's work record is no better than Brady's. It is uncontradicted that Laster received disciplinary warnings for repeatedly leaving his post unsecured and for failure to obey orders. He was also warned that any future failure to obey orders might result in his termination. On May 5, 1994, Laster left the latch down on a lobby door, which damaged the door and left it unlocked, and on that same day repeatedly rolled his sleeves up in violation of company rules and against the orders of his supervisor.

In light of this evidence, Brady's and Laster's references to racial discrimination amount, at best, to conclusory assertions seemingly thrown in just to trigger the protections of Title VII. Indeed, the Equal Employment Commission found "no probable cause to believe" that Laster's termination "was because of his national origin or retaliation" and found that Brady's termination was "for abandoning [his] post without notifying [his] supervisor, together with [his] prior disciplinary history." This Court agrees with the Equal Employment Commission. Accordingly, this Court finds as a matter of law that there is no basis under Title VII for plaintiffs' claims of retaliatory discharge.

IV

For the foregoing reasons, defendants' motion for summary judgment is granted.

So ordered.