**Janet R. MARKS Plaintiff,**

v.

**NEW YORK UNIVERSITY and George G. Daly, Defendants.**

**No. 98 CIV. 0439(RPP).**

United States District Court, S.D. New York.

Aug. 31, 1999.

Jacobs, DeBrauwere & Dehn, LLP, New York City, by Francis X. Dehn, for Plaintiff.

Anderson Kill & Olick, P.C., New York City, by Dona S. Kahn, Mededith Fein Lichtenberg, for Defendants.

## OPINION AND ORDER

PATTERSON, District Judge.

This case involves employment related disputes between plaintiff Janet R. Marks ("Marks") and her former employer, New York University ("NYU").[1] Plaintiff alleges breach of an employment contract and a separation agreement, unlawful eviction from NYU-owned housing and discrimination in the compensation, terms and conditions of her employment on the basis of age and sex in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (the "ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"), and the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. (the "NYSHRL").[2]

---

**1.** George G. Daly ("Daly"), who was the Dean of NYU's Stern Business School, where plaintiff worked, between August 1993 and the end of plaintiff's employment in December 1996, was originally a defendant in this lawsuit. Plaintiff voluntarily dismissed all her claims against Daly by means of a stipulation approved by the Court on May 17, 1999.

**2.** In her complaint, plaintiff claimed that she was subject to a hostile work environment in violation of the ADEA and Title VII. (Compl.¶¶ 41–45, 57–60.) After the filing of the complaint, but before the filing of plaintiff's papers in opposition to defendants' motion for summary judgment, the Supreme Court decided *Burlington Industries, Inc. v.*

NYU has moved for summary judgment on all of plaintiff's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons which follow, defendant's motion is granted in its entirety and plaintiff's complaint is dismissed.

### FACTUAL BACKGROUND

Due to plaintiff's failure to file a statement of disputed material facts pursuant to Local Rule 56.1, the facts set out in NYU's Rule 56.1 Statement are deemed admitted. *See* Civil Rule 56.1(c), Local Rules of the United States District Courts for the Southern and Eastern Districts of New York; *see also Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998).[3] The undisputed facts of the case, drawn verbatim from NYU's Rule 56.1 Statement, are as follows:

#### Background

1. Plaintiff Janet R. Marks ("Marks") was employed at NYU's Stern School of Business ("Stern") from the fall of 1971 until December, 1996. *See* Verified Complaint, filed January 22, 1998, ("Complaint") ¶ 8, Exh. 1 to the Affidavit of Donna S. Kahn, Esq., ("Kahn Aff."); Answer and Counterclaim, March 10, 1998 ("Answer"), ¶ 8, Exh. 2 to the Kahn Aff.

2. As of August, 1993, when Daly became the Dean of the Stern School, Marks was Associate Dean for MBA Education. *See* Complaint ¶ 8; Deposition of Janet R. Marks, dated September 10, 1998 & January 11, 1999 ("Marks dep."), at 43, Exh. 3 to the Kahn Aff.;

Deposition of George G. Daly, dated November 12, 1998 & February 17, 1999 ("Daly dep.") at 6, 15, Exh. 4 to the Kahn Aff.

3. As of September 1, 1995, Marks was appointed as an Associate Clinical Professor at Stern. *See* Letter from L. Jay Oliva to J. Marks, April 19, 1996, Exh. 5 to the Kahn Aff; Daly dep., at 72. Her appointment letter specified that she was to perform "[f]ull time" duties as a Associate Clinical Professor for a term ending January 14, 1999. *See id.* ˙ No tenure implications were attached to the position. *See id.*

4. That letter also provided for a secondary appointment as Associate Dean for International Programs and MBA Initiatives, a new position, created for plaintiff. *See id.;* Daly dep., at 74.

5. Under this dual appointment, $95,500—approximately 90% of Marks' annual salary—was attributable to her duties as an Associate Clinical Professor, and the remainder, $10,611, was payment for her duties as Associate Dean. *See* Kahn Aff., Exh. 5.

6. Marks held both positions until the Associate Deanship was eliminated in September, 1996. *See* Letter from T. Pugel to J. Marks, August 28, 1996, Exh. 6 to the Kahn Aff.

7. Thereafter, until November 30, 1996, Marks was paid as a full time Associate Clinical Professor at Stern, at a rate of $95,500 annually. *See* NYU "Change Primary" Form, Kahn Aff., Exh. 27.

---

*Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The evidence shows that NYU provided avenues for employee discrimination complaints, and that plaintiff never made any complaint of discriminatory treatment to NYU. (N.Y.U's Rule 56.1 Statement ¶¶ 36, 37.) Plaintiff voluntarily withdrew her hostile environment claims in her memorandum of law opposing defendants' motion for summary judgment. (Pl.'s Mem. in Opp. at 1 n. 1.)

Plaintiff also originally asserted a claim under the Equal Pay Act, 29 U.S.C. § 206(d), (Compl.¶¶ 53–56), but voluntarily withdrew this claim in the same memorandum of law, (Pl.'s Mem. in Opp. at 1 n. 1).

3. Plaintiff's papers in opposition include copies of depositions of Marks, Daly and others, no part of which contradicts NYU's Rule 56.1 Statement. Where appropriate to supplement the facts plaintiff is deemed to have admitted, references will be made in this opinion to the depositions and record evidence submitted by plaintiff, as well as that submitted by NYU.

## Events Leading Up To Marks' Departure From NYU

8. Marks was informed in July, 1996 that her Associate Deanship would be eliminated in September, 1996, but she would remain a full time faculty member. *See* Exh. 6 to the Kahn Aff.; Marks dep., at 97–98.

9. Marks approached Daly in late August or early September, 1996, seeking to negotiate a separation package for herself, informing Daly that she had decided she would like to leave NYU. *See* Marks dep., at 249.

10. NYU does not routinely provide severance payments to employees who depart voluntarily. *See* Daly dep. at 123–24; NYU Admin. and Prof'l Handbook at 21, Exh. 7 to the Kahn Aff.

## The October 8 Offer

11. NYU offered Marks a separation agreement to Marks on October 8, 1996. (The "October 8 Offer"). *See* Exh. 12 to the Kahn Aff; Complaint ¶ 21.

12. By its terms, the October 8 Offer was not irrevocable, nor did it contain consideration for an option contract. *See* Exh. 12 to the Kahn Aff.

13. The October 8 Offer provided for severance pay and retirement benefits and specified that, in return for valuable consideration, Marks released NYU from all future claims she might have "under the Age Discrimination in Employment Act or any other federal, state, local or other law. . . ." *See* Exh. 12 to the Kahn Aff., at ¶¶ 3,4,6,7.

14. The October 8 Offer provided that Marks could consider the Release for 21 days. *See id.* at ¶ 5.

## Marks' Employment at Fordham University Business School

15. Marks had been offered a full time position at Fordham University Business School, a competitor of NYU, in June of 1996. *See* Marks dep. ex. 3, Kahn Aff., Exh. 8; Deposition of Ernest L. Scalberg, dated February 11, 1999 ("Scalberg dep."), at 29 (Fordham's June, 1996 offer of full time employment remained on the table through the summer), Exh. 9 to the Kahn Aff.

16. Marks had begun to work at Fordham in July, 1996, in preparation for the "full time" position Fordham had offered her, slated to begin on October 1, 1996. *See* Marks dep. ex. 5, Kahn Aff. Exh. 10; (appointment letter dated August 1, 1996); Fordham Record of Hiring Report, July 30, 1996, Exh. 11 to the Kahn Aff.

17. Marks was paid an annual salary of $102,000 from Fordham University as of October 1, 1996. *See* Marks' Fordham appointment as Associate Dean, Kahn Aff., Exh. 22; Marks' Fordham offer of Associate Professorship, Kahn Aff., Exh. 23; Acceptance and Payroll Deduction Form, Kahn Aff., Exh. 24; Personnel Action Form, Kahn Aff., Exh. 25; Personnel Record Card, Kahn Aff., Exh. 26.

18. Marks was paid $20,000 at a rate of $75/hour for her work at Fordham during August and September, 1996. *See* Scalberg dep., at 67–70.

## Marks Sends NYU A Counter-Offer

19. In response to the October 8 Offer, Marks sent a revised proposed agreement to NYU on October 23, 1996, *see* Exh. 13 to the Kahn Aff, which altered several of the existing provisions of the October 8 Offer, providing that: (1) Marks would be allowed to work for NYU in the future; (2) Records would reflect that Marks left employment at NYU for "early retirement," rather than resignation; (3) Marks' retirement would be effective December 31, 1996 rather than October 7, 1996, providing approximately three months additional salary; (4) Severance would be paid, and benefits afforded, at a different time than originally specified. *See* Kahn Aff., Exh. 13, at ¶¶ 1, 6, 10.

20. Marks' revision also provided the following new terms: (1) NYU would provide Marks with a "most favorable" letter of reference, which she would draft, and had a continuing obligation to speak favorably of Marks; (2) NYU would release any and all claims against Marks; (3) Marks and NYU would mutually agree not to engage in any disparaging remarks about each other; (4) Marks would be entitled to remain in NYU-owned housing. *See* Exh. 13 to the Kahn Aff., at ¶¶ 7,8,9,11.

### NYU Revokes the October 8 Offer

21. While waiting for Marks to sign the October 8 Offer, Daly learned from one of NYU's faculty members that he was told Marks was employed by Fordham University. *See* Daly dep., at 146.

22. Thereafter, on October 28, 1996, Daly informed Marks that NYU's October 8 Offer was revoked, and requested that she report for duty at NYU. *See Complaint* ¶ 22; Letter from G. Daly to J. Marks, October 28, 1996, Exh. 14 to the Kahn Aff.

23. Marks did not report for duty at NYU; instead, she signed and returned the October 8 Offer. *See Complaint* ¶ 22; Letter from J. Marks to G. Daly, October 29, 1996, Exh. 15 to the Kahn Aff.

24. Daly then informed Marks that, since NYU had revoked its offer, he did not consider her signature on the October 8 Offer to be effective. *See* Complaint ¶ 22; Letter from G. Daly to J. Marks, October 31, 1996, Exh. 16 to the Kahn Aff.

25. Marks sent a letter demanding that NYU perform the terms of the October 8 Offer. *See* Letter from M. Pollet esq. to A. Schaffer, November 13, 1996, Exh. 17 to the Kahn Aff.

### Marks Informs NYU She Is Working Full Time For Fordham

26. On December 3, she wrote to Thomas Pugel ("Pugel"), Vice Dean of the Stern School, informing NYU that she was working full time at Fordham University. *See* Exh. 18 to the Kahn Aff.

27. NYU's Faculty Handbook, which governs faculty throughout NYU, restricts outside employment to one day per week. Faculty Handbook at 60–61, Exh. 20 to the Kahn Aff.

28. This policy applies equally to all faculty members, even to those who are not teaching during a particular term. See Stern School Policies and Procedures Pertaining to Faculty at 13, Exh. 21 to the Kahn Aff.

29. NYU Rules also specifically state that "it is expected that a faculty member would normally consult his or her dean" in a situation in which he or she would be "employed by another academic institution other than while on leave of absence from the University." Exh. 20 to the Kahn Aff. at 115–C.

30. The policy recognizes that faculty members have many duties outside the classroom, *see id.*, and seeks to assure a sustained level of commitment to those duties, and to the NYU community, even during non-teaching periods. *See* Affidavit of George G. Daly, ("Daly Aff.") at ¶ 2. It also protects NYU from conflicts of interest inherent in unlimited outside employment. *See* Daly Aff. at ¶ 2; Exh. 20 to the Kahn Aff. at 115A–D. NYU faculty are regularly required to submit records of their outside commitments for approval by the Dean and the President of NYU. *See* Daly Aff. ¶ 2.

31. The policies set out in the Faculty Handbook govern the entire University, and "can be changed only by action of the body or bodies that enacted them." *See* Kahn Aff., Exh. 20, at 7.

32. On December 6, Pugel informed Marks that she was terminated for violating NYU's policies on outside employment. *See* Letter from T. Pugel to J. Marks, Exh. 19 to the Kahn Aff.

33. Marks indicated to Fordham on December 11, 1996 that she had never been discharged from a job. *See* "Application For Employment," Kahn Aff., Exh. 28.

### Martin Levine

34. NYU hired Martin Levine on January 17, 1995 for the newly created position of Associate Dean of Admissions and Placement. *See* Kahn Aff., Exh. 29.

35. NYU paid Marks more money from January to September, 1995 than it paid Levine, *see* Exh. 29 to the Kahn Aff.

### NYU's Equal Employment Opportunity Procedures

36. NYU has an Equal Employment Opportunity compliance office and specific rules regarding workplace conduct which forbid discriminatory conduct and provide avenues for employee complaints about discrimination. *See* Exh. 20 to the Kahn Aff. at 107–108C; Exh. 7 to the Kahn Aff. at 5–6 (Statement of Policy, informal and formal complaint procedures).

37. Plaintiff never made a complaint about discriminatory treatment to anyone as specified in NYU's policy. *See* Marks dep., at 25, 61–62, 178, 244.

### Facts Relating To Specific Allegations In The Complaint

38. Plaintiff's office was moved on February 2, 1996. *See* Kahn Aff., Exh. 30.

39. NYU eliminated the position of Associate Dean of International Programs and MBA Initiatives, a new position created for plaintiff, after her supervisor concluded that the position did not contribute to the school as much as hoped. *See* Deposition of T. Pugel, dated April 6, 1999 ("Pugel dep.") at 27–29, 43, Exh. 31 to the Kahn Aff.; Daly dep., at 71, 74.

### Marks' Housing

40. When Marks was terminated by NYU in December of 1996, she was living in NYU-owned housing, under a lease set to expire on August 31, 1997 (the "Lease"). *See* Exh. 32 to the Kahn Aff.

41. Marks' Lease provided that her tenancy was conditioned on full time employment with NYU, and NYU could repossess 30 days after she ceased to be a full time employee. *See* Rider, ¶¶ 1–5, Kahn Aff., Exh. 32.

42. NYU gave requisite notice of cancellation of the Lease in April, 1997. *See* Kahn Aff., Exh. 33.

43. Marks commenced an action in New York State Supreme Court to prevent NYU from terminating the Lease. *See Marks v. NYU,* No. 109704/97 (Sup. Ct. N.Y. Cty. filed May 27, 1997).

44. Supreme Court denied Marks' motion for a preliminary injunction in October, 1997. *See* Kahn Aff., Exh. 34.

45. Thereafter, NYU commenced a holdover proceeding in New York City Civil Court to recover possession. *See NYU v. Marks,* No. L & T 108296/97 (Civ.Ct.N.Y.Cty. October 24,1997).

46. Civil Court denied the preliminary relief Marks sought. *See* Kahn Aff., Exh. 35.

47. Marks and NYU stipulated a settlement of the holdover proceeding, which allowed Marks to remain in the apartment through June 30, 1998, ten months after the expiration of her Lease term. *See* Stipulation of Settlement, Exh. 36 to the Kahn Aff.

48. Marks' Lease provided that tenants who retire are entitled to remain in occupancy until the end of the lease term or for one year following the retirement date, whichever period is shorter. *See* Lease Rider, Kahn Aff., Exh. 32, at ¶ 16.

49. University housing policies for retirees create a possibility of continued housing in NYU owned residences for

certain retirees over age 60. *See* Rpt. # 3 of the Univ. Housing Comm., Kahn Aff., Exh. 34.

50. Plaintiff was 47 years old when she was terminated by NYU. *See* Complaint ¶ 8.

(N.Y.U's Rule 56.1 Statement ¶¶ 1–50.)

## *DISCUSSION*

### A. *Standard for Summary Judgment*

The Second Circuit has summarized the standards for granting summary judgment as follows:

First, summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Second, the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists. In considering that, third, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. Fourth, the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.

Fifth, when deciding whether this drastic provisional remedy should be granted in a discrimination case, additional considerations should be taken into account. A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue.... Finally, the trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.

*Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted).

Notwithstanding the care with which a court must treat employment discrimination cases, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.) (granting summary judgment for employer on Title VII claim), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *see also Viola v. Philips Med. Sys. of North America,* 42 F.3d 712, 715–19 (2d Cir.1994) (granting summary judgment for employer on ADEA claim); *Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir.1994) (same). To overcome a properly asserted motion for summary judgment, a nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts" and "must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*).

### B. *Breach of Contract*

#### 1. *General Standards Applicable to Both Breach of Contract Claims*

█ The elements of a breach of contract claim under New York law are: "(1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and, (4) damages resulting from the breach." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters,* 827 F.Supp. 985, 988 (S.D.N.Y. 1993); *see also, e.g., Coastal Aviation, Inc. v. Commander Aircraft Co.,* 937 F.Supp. 1051, 1060 (S.D.N.Y.1996), *aff'd,* 108 F.3d 1369 (2d Cir.1997). Because the plaintiff must prove each of these elements, the absence of a genuine issue of material fact

due to lack of support for any one of them will require an award of summary judgment in favor of the defendant. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[4]

### 2. *Breach of the Separation Agreement*

■■■ Plaintiff alleges that NYU failed to honor the October 8, 1996 Separation Agreement signed by plaintiff on October 29, 1996. (Compl. ¶ 71; Pl.'s Mem. in Opp. at 17–21.) However, Marks has failed to establish the first element of a breach of contract claim, namely the existence of a contract between herself and NYU. It is well established under New York law that an offeree's power of acceptance is terminated when an offer is validly revoked. *See Cumis Ins. Soc'y, Inc. v. Citibank, N.A.,* 921 F.Supp. 1100, 1106 (S.D.N.Y. 1996). Revocation is effective upon receipt. *See id.; Buchbinder Tunick & Co. v. Manhattan Nat'l Life Ins. Co.,* 219 A.D.2d 463, 466, 631 N.Y.S.2d 148, 150–51 (1995); Restatement (Second) of Contracts § 42 (1981). In this case, NYU revoked its October 8, 1996 offer by means of a letter dated October 28, 1996. Plaintiff does not argue that her execution of the Separation Agreement on October 29, 1996

was made before receipt of NYU's revocation,[5] and does not urge the Court to find her acceptance of the Separation Agreement effective under New York common law. (Pl.'s Mem. in Opp. at 17–21.)

■■■ Plaintiff argues, however, that NYU's offer of October 8, 1996 was irrevocable under the terms of the Older Workers' Benefit Protection Act, 29 U.S.C. § 626(f) (1994) (the "OWBPA"). The OWBPA provides in relevant part:

(f) Waiver

(1) An individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary. Except as provided in paragraph (2),[6] a waiver may not be considered knowing and voluntary unless at a minimum—

. . . .

(F)(i) the individual is given at least 21 days within which to consider the agreement . . . .

29 U.S.C. § 626(f). Plaintiff argues that this clause creates a twenty-one day option contract, i.e., a twenty-one day period during which any offer by an employer containing a release of ADEA claims is irrevocable. However, the OWBPA does not

---

4. After a district court has dismissed all federal claims over which it had original jurisdiction, it may exercise supplemental jurisdiction over remaining state law claims if considerations of judicial economy, convenience, and fairness to litigants are implicated. *See Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir.1994); *see also Philan Ins. Ltd. v. Frank B. Hall & Co.,* 786 F.Supp. 345, 347–48 (S.D.N.Y.1992) (exercise of supplemental jurisdiction may be appropriate even when federal claims are dismissed before trial). Given the time and resources this Court and the parties have expended in preparation for a federal trial, it is economical, convenient and fair that this Court should entertain the remaining state claims. Moreover, no state law claim raises novel or complex issues of state law better resolved in a state court. *Cf. Morse v. University of Vermont,* 973 F.2d 122, 127–28 (2d Cir.1992) (holding that district court abused discretion by exercising jurisdiction over state law claims after dismissing federal claims when these claims involved novel questions of state law). This Court therefore

uses its discretion under 28 U.S.C. § 1367 (1994) to exercise supplemental jurisdiction over plaintiff's state law breach of contract claims notwithstanding the dismissal of plaintiff's federal claims, *see infra* pp. 33–34.

5. In her complaint, plaintiff stated that "on October 28, 1996 (the 20th day), Plaintiff was informed by Daly that the proffered Separation Agreement was withdrawn," and that plaintiff executed the agreement on October 29, 1996 "[i]n fear that Daly planned to impose even more grossly unfair retirement terms on her." (Compl. ¶ 22; *see also* Pl.'s Mem. in Opp. at 18.)

6. Paragraph 2 of § 626(f) covers any "waiver in settlement of a charge filed with the Equal Employment Opportunity Commission, or an action filed in court by the individual or the individual's representative, alleging age discrimination of a kind prohibited under section 623 or 633a of [volume 29 of the United States Code]." 29 U.S.C. § 626(f)(2).

state, "an individual must be given 21 days within which to consider the offer," but only, "a waiver may not be considered knowing and voluntary unless ... the individual is given a period of at least 21 days within which to consider the offer." (*Id.*) Accordingly, the OWBPA does not replace the common law right of an employer to revoke an offer prior to acceptance. The only circuit court to address this issue, the Eighth Circuit, held in *Ellison v. Premier Salons International, Inc.* that § 626(f) of the OWBPA "does not create an irrevocable twenty-one-day power of acceptance for offered separation agreements that include waivers of ADEA claims." 164 F.3d 1111, 1115 (8th Cir.1999). Since it is consistent with the language of the statute, the rule of the Eleventh Circuit will be followed.[7] Accordingly, NYU's motion for summary judgment on plaintiff's claim of breach of the Separation Agreement is granted.

### 3. Breach of the Employment Contract

Plaintiff claims that NYU breached her employment contract by terminating her on December 6, 1996, more than two years prior to the expiration of her contract. (Compl. ¶ 72; Pl.'s Mem. in Opp. at 21–24.) The parties do not dispute the existence of an employment contract between Marks and NYU, (N.Y.U's Rule 56.1 Statement ¶ 3), the terms of which are detailed in the letter from L. Jay Olivia to Marks dated April 19, 1996, (Kahn Aff., Ex. 5). The appointment letter states that Marks' position is "[f]ull time" and that her contract as Clinical Associate Professor terminates on January 14, 1999. (Kahn Aff., Ex. 5 (Appointment letter); NYU's Rule 56.1 Statement ¶ 3.) Notwithstanding the exis-

tence of this contract and NYU's termination of plaintiff prior to its expiration, plaintiff's claim of breach of contract fails due to the defective nature of her own performance, namely, her assumption of full-time work at Fordham University Business School during the time she was under contract with NYU.

The parties do not dispute that the terms of plaintiff's employment were governed by the Faculty Handbook of New York University, which restricts outside employment to one day per week. (N.Y.U's Rule 56.1 Statement ¶ 27.) The Handbook provides:

> As a matter of University policy, full-time members of the faculty are required to teach only at New York University during the period of their regular teaching assignments (normally, September to June). Teaching service at other institutions during such period may not be rendered except in the most unusual circumstances and must be duly approved by the appropriate dean and by the Provost and Executive Vice President for Academic Affairs.

> Assignments to full-time members of the faculty, professional research and library staffs, and administration are made on the assumption of full-time service to the University....

> In general ... full-time members of the faculty will be expected to limit their outside activities for which compensation is received to not more than one day per week during the periods of their regular teaching assignments.

> As a matter of courtesy, faculty members are expected to inform their departmental chairpersons and deans of

---

7. The Supreme Court's decision in *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998), does not require an alternative outcome. In *Oubre*, the Supreme Court held that a waiver of ADEA claims is not valid absent compliance with the requirements of § 626(f) of the OWBPA. *See id.* at 841–42. *Oubre* does not provide a basis for concluding that § 626(f) does anything more than prescribe the requirements for an

effective waiver of ADEA claims. *See Ellison*, 164 F.3d at 1115 ("In *Oubre*, the Court addressed only whether a waiver, once agreed upon by both parties, is effective to bar claims under the ADEA when the waiver does not comply with the OWBPA. The Court did not discuss contract formation issues such as rejection and revocation, and it never stated that all common law contract principles were preempted by the OWBPA.").

the general nature and extent of any such continuing commitments.

(Kahn Aff., Ex. 20 at 60–61.)

Moreover, the Stern School Polices and Procedures Pertaining to Faculty, 1991–1992, reinforce the rule "all full-time faculty members—both those holding tenure-track appointments and clinical appointments—are expected to devote at least four days per week to University business . . . during each of the fall and spring semesters." (Kahn Aff., Ex. 21 at 13.) These Stern School Policies and Procedures emphasize that "all faculty, even those who, on rare occasions, are not scheduled to teach in a given term, must abide by these rules [concerning outside employment]." (*Id.;* NYU's Rule 56.1 Statement ¶ 28.)[8] The NYU rules also state that "it is expected that a faculty member would normally consult his or her dean and, if necessary the Committee on Institutional Responsibility" in any situation in which he or she would "be employed by another academic institution other than while on leave of absence from the University." (Kahn Aff., Ex. 20 at 115–C; NYU's Rule 56.1 Statement ¶ 29.)

Plaintiff admits that she began to work full-time at Fordham in November or December 1996. (Marks Dep. at 239, 241; NYU's Rule 56.1 Statement ¶ 26.)[9] This outside employment constitutes a failure by plaintiff to duly perform the terms of her employment contract.

█ Plaintiff claims in her memorandum of law that Daly told her she could accept full-time employment at a competing educational institution. (Marks' Mem. in Opp. at 23–24.) However, Marks' deposition testimony does not support that

Daly made any such statement. Marks testified in her deposition that in the Spring of 1995, when she and Daly discussed the upcoming shift in her job description from full-time Associate Dean to Associate Clinical Professor and part-time Associate Dean,

> I said you're lowering my salary and I[sic] said one of the nice things about being clinical is that you can hold another job at the same time.

(Marks Dep. at 119.)

Plaintiff's contention that "if he only meant part-time employment, there would have been no reason for him to make any statement at all," (Pl.'s Mem. in Opp. at 24 n. 8), is unfounded. Such a conversation does not constitute approval of Marks' engaging in outside employment for more than "one day per week," (Kahn Aff., Ex. 20 (N.Y.U Faculty Handbook) at 60), nor does it constitute approval of employment by "another academic institution," (Kahn Aff., Ex. 20 (Statement of Policy on Faculty Responsibility to the University) at 115–C). Plaintiff's supposition that Daly could only have meant "full-time" employment is speculation. Daly's statement is fully consistent with the policy in the NYU Handbook and the Stern School Policies and Procedures that outside employment is generally permitted up to one day per week, and does not show that Daly authorized a departure from that policy. Daly's words were not spoken in the context of a discussion about full-time outside employment at Fordham (or any another competing academic institution). Indeed, at the time, Marks did not interpret Daly's remarks to mean she could accept a full-time position outside NYU. (Marks Dep. at

---

8. Due to this statement in the Stern School Policies and Procedures, plaintiff's argument that her work at Fordham was justified by her lack of teaching and administrative responsibilities at NYU from July 1996 through December 1996 is rejected. (Pl.'s Mem. in Opp. at 21–24.)

9. Marks' letter of appointment for a full-time position at Fordham is dated October 31,

1996, but states "The appointment is retroactive to October 1, 1996." (Kahn Aff., Ex. 22.) The record shows that Marks was paid an annual salary of $102,000 as of October 1, 1996. (Kahn Aff., Exs. 22, 25, 26.) The evidence uniformly shows that as of plaintiff's termination on December 3, 1996, she was working full-time at Fordham.

122.) No rational jury could find that Daly's words authorized a departure from NYU policy, or that his words could reasonably be interpreted to mean that she could take a full-time position at Fordham.

Although plaintiff was an Associate Dean and an Associate Clinical Professor, she admits that she did not read the NYU Handbook which outlined the limits on outside employment, (*id.* at 118, 237–38), and based her belief that she could accept full-time work at a competing institution in part on her later-acquired understanding of Daly's words and in part on her impression that other NYU faculty members had full-time outside jobs. (*Id.* at 240.) [10] However, Marks never found out whether these other faculty members had obtained permission to perform outside work. (*Id.* at 116.) There is no evidence—indeed, there is not even any pleading, (Compl. ¶ 27; Pl.'s Mem. in Opp. at 23)—that NYU failed to require other faculty members to obtain permission before working full-time at outside institutions.

Marks admits she did not consult with anyone about the permissibility of full-time work at Fordham. (Marks Dep. at 238.) She asserts that it was her belief that "[t]here was no need to." (*Id.* at 236.) Both the NYU Faculty Handbook and the Stern School Policies and Procedures require such approval, and plaintiff has presented no evidence to support her claim that she did not need to seek such approval. Nor has plaintiff presented evidence of NYU's past treatment of other faculty members, or any admissions by Daly or Pugel, to demonstrate that such permission was not required. Plaintiff's outside employment at Fordham violated her employment contract with NYU and bars her claim against NYU for breach of contract.

Accordingly, NYU's motion for summary judgment on plaintiff's claim of breach of the employment contract is granted.

### C. *Discrimination Under Title VII, the ADEA and the NYSHRL*

#### 1. *General Standards*

■ To evaluate plaintiff's claims of sex and age discrimination under Title VII, the ADEA and the NYSHRL, this Court employs the familiar three-part burden shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).[11] Under this framework of analysis, the plaintiff must first establish a prima facie case by showing that: (1) she is a member of a protected class; (2) she was performing her job duties satisfactorily; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Stratton v. Department for the Aging,* 132 F.3d 869, 879 (2d Cir.1997); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994); *Nweke v. Prudential Ins. Co. of America,* 25 F.Supp.2d 203, 224 (S.D.N.Y.1998). The plaintiff's burden at this stage is "substantially less onerous than the conventional obligation to produce evidence that reasonably supports a finding on all the elements of the claim." *Fisher v. Vassar College,* 114 F.3d 1332, 1340 (2d Cir.1997) (en banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). If the plaintiff successfully establishes a prima

---

**10.** Plaintiff testified that her belief that she could hold two full-time jobs at two competing institutions was "[b]ased on what George told me and based on the fact that other faculty were doing that." (Marks Dep. at 240.) Plaintiff has offered no evidentiary support satisfying the requirements of Rule 56(e) of the Federal Rules of Civil Procedure to demonstrate that other faculty held full-time outside jobs without permission.

**11.** Claims brought under the ADEA and the NYSHRL are subject to the same burden-shifting analysis as claims brought under Title VII. *See, e.g., Raskin v. Wyatt Co.,* 125 F.3d 55, 60 (2d Cir.1997).

facie case, the burden shifts to the defendant to proffer admissible evidence of a legitimate, nondiscriminatory reason for the disputed action. *See Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089 (noting that burden on defendant is one of production, not persuasion). If the defendant meets its burden of production, the plaintiff then must carry the ultimate burden of persuasion and prove by a preponderance of the evidence that discrimination was a motivating factor in the employment decision. *See Renz v. Grey Advertising, Inc.,* 135 F.3d 217, 222 (2d Cir.1997); *Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 120–21 (2d Cir.1997); *Cartagena v. Ogden Servs. Corp.,* 995 F.Supp. 459, 462 (S.D.N.Y.1998).[12]

 Claims of discrimination brought under Title VII, the ADEA and the NYSHRL must be based on events occurring within the relevant statutory periods of limitation. 42 U.S.C. § 2000e–5(e)(1) (1994) (Title VII); 29 U.S.C. §§ 626(d)(2), 633(b) (1994) (ADEA); N.Y. C.P.L.R. 214(2) (McKinney 1990) (N.Y.SHRL). In New York, a plaintiff alleging discrimination under Title VII or the ADEA has up to 300 days from the time of the unlawful employment practice to file a charge with the EEOC. *See Brodsky v. City University,* 56 F.3d 8, 9–10 (2d Cir.1995) (ADEA); *Butts v. City of New York Dep't of Housing Preservation and Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993) (Title VII). Plaintiff's claims under the NYSHRL are subject to a three-year statute of limitations. *See Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997); *Gilani v. National Assoc. of Sec. Dealers, Inc.,* No. 96 CV 8070, 1997 WL 473383, at *10 (S.D.N.Y. Aug.19, 1997).

 The limitations period for claims under Title VII, the ADEA and the NYSHRL may be tolled if there is evidence of a continuing violation. *See Lightfoot,* 110 F.3d at 907 ("We have recognized a continuing-violation exception to both Title VII and ADEA cases."); *Katz v. City of New York, Dep't of Transp.,* No. 94 Civ. 8319(RPP), 1996 WL 599668, at *13 n. 8 (S.D.N.Y. Oct.17, 1996) (continuing violation doctrine applies to claims under the NYSHRL). Otherwise time-barred claims may be viable under the continuing violation doctrine only if at least one discriminatory act pursuant to the employer's policy or practice is committed within the limitations period. *See Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993), *cert. denied,* 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994); *Acha v. Beame,* 570 F.2d 57, 65 (2d Cir.1978); *Ahmed v. Samson Management Corp.,* 96 Civ. 9530(MBM), 1996 WL 183011, at *4 (S.D.N.Y. Apr. 17, 1996); *Carrasco v. New York City Off-Track Betting Corp.,* 858 F.Supp. 28, 32 (S.D.N.Y.1994), *aff'd,* 132 F.3d 115 (1997).[13]

---

12. The plaintiff's burden at the third stage of the analysis has sometimes been described as a duty to show that discrimination was the "real reason" or the "true reason" for the defendant's actions. *See, e.g., St. Mary's,* 509 U.S. at 515, 113 S.Ct. 2742; *Woroski v. Nashua Corp.,* 31 F.3d 105, 109 (2d Cir.1994); *Viola v. Philips Med. Sys. of North America,* 42 F.3d 712, 716–17 (2d Cir.1994). However, in recent opinions the Second Circuit has criticized those terms. *See Renz,* 135 F.3d at 221–223 & n. 5; *Fields,* 115 F.3d at 120–21; *see also Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1225 (2d Cir.1994) (to show that discrimination was the " 'real reason' " for the employer's actions, the plaintiff must show that "it is more likely that a discriminatory reason motivated the employer" (quoting *St. Mary's,* 509 U.S. at 515, 113 S.Ct. 2742)).

13. NYU argues in its reply memorandum of law that plaintiff cannot rely on the continuing violation doctrine because she failed to plead a policy or pattern of discrimination in her EEOC charge or in her complaint. (N.Y.U's Reply Mem. at 5 (citing *Miller v. International Tel. & Tel. Corp.,* 755 F.2d 20, 25 (2d Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985), and *Ahmed,* 1996 WL 183011, at *4).) However, plaintiff, who had retained counsel, stated in the affidavit accompanying her EEOC charge, "NYU's conduct towards me ... constitutes a continuous pattern of discrimination." (Kahn Aff., Ex. 38 ¶ 14.) In her complaint, plaintiff pled "a pattern and practice of sex-based discrimi-

Marks filed her EEOC charge on May 6, 1997, (Compl. ¶ 39; Kahn Aff., Ex. 38), and therefore only those claims based on adverse actions taken on or after July 9, 1996 are timely for purposes of her Title VII and ADEA causes of action. Plaintiff alleges three adverse actions occurring during this statutory period of limitations: (1) the decision to terminate her part-time Associate Deanship position on July 27, 1996 (effective on September 1, 1996) with an accompanying reduction in salary; (2) the revocation of the Separation Agreement by letter dated October 28, 1996; and (3) her discharge from NYU on December 1, 1996.

As to plaintiff's NYSHRL cause of action, plaintiff's timely claims are those based on adverse actions taken during the three year period before January 22, 1998, the date when plaintiff filed her federal complaint. Plaintiff's timely claims under the NYSHRL are those aforementioned and additionally her claims that in February 1996 Daly moved her office off of the Dean's floor and thereafter virtually refused to communicate with her regarding Stern matters. (Compl.¶ 62.)

For the reasons discussed below, plaintiff is unable to establish that any of these actions constitute actionable discrimination. As a result, the continuing violation doctrine is inapplicable, and no other of plaintiff's claims are potentially actionable.

### 2. *Timely Claims of Sex and Age Discrimination*

It is undisputed that plaintiff, a 47 year old woman at the time she was discharged by NYU, is a member of the relevant protected classes with respect to both sex and age discrimination. Defendant does not claim that plaintiff was performing her job duties as Associate Clinical Professor in an unsatisfactory fashion prior to her employment at Fordham in violation of NYU policies. However, plaintiff's failure to comply with NYU's rules concerning outside employment renders her performance of her job duties unsatisfactory at least as of November or December 1996, when plaintiff admits to having begun full-time work at Fordham. (Marks Dep. at 241.) Plaintiff is therefore unable to establish a prima facie case with respect to her claim of discriminatory discharge as Associate Clinical Professor.[14] As to plaintiff's remaining claims, NYU does not dispute that plaintiff was subject to an adverse employment action in each case.[15]

---

nation" and an "ongoing pattern and practice of age discrimination." (Compl.¶ 47, 58.) Plaintiff specifically alleged in her complaint that Daly "initiated a campaign of job discrimination" to force Marks' resignation, "continually harassed" her, and "systematically deprived Plaintiff of her position and responsibilities as Associate Dean." (*Id.* ¶¶ 16, 1.)

**14.** There is a question of fact as to whether plaintiff was employed full-time at Fordham when NYU revoked the Separation Agreement by letter dated October 28, 1996. As of August 1, 1996, Marks' full-time position at Fordham was expected to begin October 1, 1996. (Kahn Aff., Exs. 10, 11.) Marks was paid by Fordham on a full-time basis from October 1, 1996. (*Id.*, Exs. 22, 24–26.) Marks' letter of appointment at Fordham is dated October 31, 1996, "effective retroactive to October 1, 1996." (*Id.*, Ex. 22.) Marks has testified that she was not actually full-time at Fordham until November or December. (Marks Dep. at 241, 252–54.) A genuine question of material fact bars the conclusion at this stage of the litigation that plaintiff had commenced full-time work at Fordham when NYU revoked the Separation Agreement at the end of October 1996.

**15.** The loss of plaintiff's Associate Deanship, which was accompanied by a reduction in salary, and the refusal to honor the proposed Separation Agreement constitute adverse employment actions. The Court shall assume, without deciding, that the relocation of plaintiff's office in February 1996 and Daly's subsequent refusal to communicate with her regarding Stern matters also represent adverse employment actions. The Court of Appeals for the Second Circuit has not resolved whether the loss of an office may constitute an adverse employment action. *See Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997). The Court assumes *arguendo* that these qualify as adverse employment actions.

Whether Marks has provided sufficient evidence from which a reasonable jury could infer that these adverse employment actions were a result of sex or age discrimination requires a full review of the evidence presented on this motion.

Marks' case centers on allegations of sex and age discrimination by Daly. She recites numerous incidents in her deposition that might serve to establish an inference of discriminatory motive in Daly's actions toward her.

Marks testified that shortly after Daly was appointed Dean, he asked to meet Marks for dinner, and he suggested that they meet at Marks' apartment. (Marks Dep. at 104, 213.) Marks refused the suggestion and the two met at a restaurant instead and discussed business. (*Id.* at 213.) Marks testified that after the dinner, Daly "suggested taking me back to my apartment," but she again declined the offer. (*Id.* at 104–05.) Daly testified that when he arrived at the Stern School in 1993 he tried to meet with each of the Associate Deans over lunch or dinner. (Daly Dep. at 14.)

In October 1993, also shortly after he became Dean, Daly formed the Professional Programs Review Committee (the "PPRC III") whose charge it was "to review the entire portfolio of professional programs currently and prospectively offered by the Stern School." (Kahn Reply Aff., Ex. B at 3.) Marks, as Associate Dean for MBA Education, had responsibilities for the delivery and staffing of the MBA program and the supervision of matters relating to student admissions, placement and services. Marks alleges that two of the five members of the committee were "perhaps" biased against women or "had their own agendas," though her allegations are conclusory in nature. (Marks Dep. at 73.) [16]

The report, which was published July 1, 1994, recommended that the MBA programs and core curriculum should be reconfigured and "[t]he Core should be managed by a highly respected faculty member." (Kahn Reply Aff., Ex. B at 14.) Daly testified that this recommendation served as a basis for his selection, in the summer of 1994, of Avijit Ghosh, a man, for the post of Vice Dean of Graduate Programs. (Daly Dep. at 43–44.) At the time of the selection, Ghosh was a professor of marketing at Stern while Marks did not meet the criteria of being a "faculty member." (*Id.* at 44.) Marks' duties relating to the delivery and staffing of the MBA program were thereafter transferred to Ghosh. (Daly Dep. at 47–48.) Daly's decision to follow the recommendations of the PPRC III and to reorganize plaintiff's job duties did not affect Marks' title or salary but did mean that she reported to a Vice Dean rather than himself.

On March 21, 1994, Daly formed a second committee, the Job Market Opportunities Task Force (the "Task Force"). (Kahn Reply Aff., Ex. C.) The purpose of the Task Force was "to evaluate Stern's performance and make recommendations regarding future job market opportunities for graduates of the MBA program." (*Id.* at 1.) At the time the Task Force was formed, Marks' duties included admissions, advising, financial aid, student affairs, placement, and registration. (Marks Dep. at 68.) On June 27, 1994 the Task Force recommended the creation of a new full-time post to focus on issues of admissions, financial aid and placement. (Kahn Reply Aff., Ex. C at 4.) It was recommended that

---

**16.** Of the five members of the PPRC III, Marks claimed that Ingo Walter and Avijit Ghosh were biased against women. (Marks Dep. at 73) As to Walter, Marks alleged: "I think if you looked at his record, any records about him in terms of his hiring and promotion, there were few, if any, women. As best I can explain it, he was a good old boy." (*Id.* at 73–74.) Plaintiff has provided no documentation to support her hypothesis concerning Walter's record. As to Ghosh, plaintiff admitted, "I'm not sure I can think specifically why he would be biased—I can't think of specific examples why he would be biased against women." (*Id.* at 74.)

this new Director of Admissions and Placement report directly to the Dean. (*Id.*) The Task Force did not make a recommendation as to the staffing of this position, other than to suggest that an executive search team be employed to identify the ideal candidate for the position. (*Id.*)

Plaintiff alleges that this Task Force, like the PPRC III, was composed by Daly of persons he knew were biased against her. (Marks Dep. at 58–59, 67.) The committee included Roy Smith, Prof. William Guth, Prof. Jarl Kallberg, William Kealy, Prof. Thomas Pugel, Thomas Schick, Prof. William Silber, and Donna Simon. (Kahn Reply Aff., Ex. C at 4.)[17] Marks brought her concerns about the composition of the Task Force to Daly's attention but he did not change its membership. (Marks Dep. at 69.)

On the Task Force's recommendation that a new Director of Admissions and Placement be appointed, a search was done and Martin Levine was hired as Associate Dean of Admissions and Placement, whose appointment was effective January 17, 1995. (Marks Dep. at 70; Kahn Aff., Exh. 29 at 1; NYU's Rule 56.1 Statement ¶ 34.) Levine assumed Marks' duties over admission and placement of students, (Marks Dep. at 70), but Marks was not terminated. Beginning in the Spring of 1995, Daly and Marks began having discussions about appointing Marks as a clinical faculty member. (Marks Dep. at 119.) NYU authorized that she receive

a $10,000 increase in salary for teaching an additional course. (Kahn Aff., Ex. 29.) Effective September 1, 1995, Daly appointed Marks as an Associate Clinical Professor and in addition created a new position for her, Associate Dean for International Programs and MBA Initiatives, reporting to Vice Dean Pugel. (Kahn Aff., Ex. 5; NYU's Rule 56.1 Statement ¶ 3–4.) Approximately ninety percent of her salary was attributable to her duties as Associate Clinical Professor. (N.Y.U's Rule 56.1 Statement ¶ 5.)

In February 1996, while Marks was Associate Clinical Professor and Associate Dean for International Programs and MBA Initiatives, Daly moved Marks' office from his floor to another floor. (Marks Dep. at 104; Kahn Aff., Ex. 30.) Marks claims that the new office was a "little office that was not an associate dean's office." (Marks Dep. at 104.) She also claims Daly "certainly didn't do that to anyone else," though she has provided no evidence of similarly situated persons being treated differently. (*Id.*) Marks claims that after the move, Daly "just basically ignored me." (*Id.*) However, there is no evidence in the record, nor does Marks allege, that Daly ignored Marks but continued to communicate with similarly situated males or younger employees who had recently ceased to report to him and were currently reporting to other supervisors.

A decision was made in August 1996 to eliminate the Associate Dean position held

---

**17.** Plaintiff claims that Guth was biased because he once stood up in the middle of a faculty meeting and said "he would never trust his wife with a credit card." (Marks Dep. at 60.) Marks alleges that she had had prior confrontations with Smith, who she alleged patted her behind inappropriately over five years before. (*Id.* at 17, 25–27.) Marks claims that she had had altercations with Silber, who had screamed at her over disappointment with Marks' scheduling of his classes. (*Id.* at 47–53.) Marks alleges that Silber was a "male chauvinist pig." (*Id.* at 52.) However, her only basis for this belief is that she was the improper person to blame for Silber's scheduling problems, (*id.* at 53), and plaintiff has admitted "I was responsible

for creating the course schedule, and he didn't like [what] I had assigned him," (*id.* at 48). As to the other members of the committee, Marks alleges that Schick was a "close friend of Bill Silber's," (*id.* at 63), Keally and Kallberg were part of the finance department of which Silber was a senior faculty member, (*id.* at 64), and Simon had already expressed dissatisfaction with the school's placement operation, which was one of the subjects of the committee's inquiry, (*id.* at 63). Daly has provided explanations for his choice of various committee members, and pointed out that he asked Marks herself to serve on the committee in an ex officio capacity. (Daly Dep. at 60–62)

by Marks. This decision was made by Daly after receipt of the unanimous views of the Vice Deans. (Daly Dep. at 84; Pugel Dep. at 27.) In a letter from Pugel dated August 28, 1996, Marks received official notice that the administrative position which had been created for her was being terminated. Pugel's letter states:

[T]he position of the Associate Dean for International Programs and MBA Initiatives was not fully defined when you accepted it. I believe that I also stated that it was clear that it needed to become better defined as you held the position, and that for whatever reasons it had not become better defined. As we discussed at the July 12 meeting, this concern was a major part of the reasoning that led the Dean's Office to conclude that the position of Associate Dean for International Programs and MBA Initiatives would cease to exist in the School after the end of August.

(Kahn Aff., Ex. 6; NYU's Rule 56.1 Statement ¶ 39.) Pugel had advised Marks when she was first appointed as Associate Clinical Professor and Associate Dean for International Programs and MBA Initiatives that "Should you cease to be Associate Dean ... the additional one-ninth summer compensation tied to duties as Associate Dean will cease to be paid." (Kahn Aff., Ex. 5 (Pugel Letter) at 2.) Her salary was reduced accordingly when the Associate Dean position was eliminated. (N.Y.U Rule 56.1 Statement ¶ 7.) The position for Marks' secretary was also eliminated. (Marks Dep. at 103.)

Marks claims that Sam Craig and Richard Brief "who were no longer deans were allowed to keep secretaries and their salaries were not reduced" after they lost their administrative posts. (*Id.*) However, she has provided no evidence to support this allegation, as required by Rule 56(e) of the Federal Rules of Civil Procedure, and NYU has provided documentation showing that Craig and Brief ceased to receive their administrative salaries when they lost their administrative roles. (Kahn Reply Aff., Ex. A.)

■ The relocation of Marks' office in February 1996, Daly's subsequent practice of ignoring her, the elimination of the Associate Deanship in August 1996 and the revocation of the Separation Agreement in October 1996 represent plaintiff's timely claims of discrimination. Plaintiff has not provided credible evidence, with respect to any of these claims, that she was treated differently than male or younger employees.[18]

Plaintiff may, however, establish her prima facie case through other means, by showing, for example, that Daly made derogatory comments about persons in a relevant protected class indicative of a discriminatory intent, *see Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994); *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir.1992), or engaged in sexual stereotyping, *see Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998). Plaintiff has provided evidence that Daly made such comments and engaged in such behavior.

Without identifying any meetings in particular, Marks testified that Daly would ignore her at staff meetings while asking men who were present to report on their projects. (Marks Dep. at 101.) She testified that Daly ignored other women in faculty meetings as well. (*Id.* at 174–75). Marks testified that in staff meetings Daly

---

**18.** Marks has provided only conclusory allegations that her office relocation was unusual, (Marks Dep. at 104), that other persons did not lose salary or their secretaries when their duties were reduced, (*id.* at 103), and that Daly negotiated more favorable departure terms with men, (*id.* at 220.) These unsubstantiated allegations do not support a prima facie case of discrimination. *See Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64–65 (2d Cir.1997) (conclusory statements of disparate treatment, unsupported by admissible evidence, do not raise genuine issue of material fact); *Henry v. Daytop Village, Inc.*, 42 F.3d 89, 97 (2d Cir.1994) (same).

commented on female faculty members being too aggressive, and, in particular, both Daly and Pugel referred to Barbara Katz, a Stern instructor, as an overly aggressive woman. (*Id.* at 179–80.) Daly was also, according to Marks, "critical of Rita Maldonabo–Baer," "because he felt that her husband [who was an adjunct faculty member] was sort of the force behind her," though Marks was unable to recall any particular comments. (*Id.* at 107–08.) She also testified that when Christine Kelly's course was removed from the list of required courses, Daly "basically considered her to be sort of an hysterical woman," and commented that Kelly "was getting emotional," though Marks was unable to remember Daly's exact words. (*Id.* at 108–09.) Marks further testified that Daly commented to her that April Fein was a "whiner" for complaining to him that her apartment was too small. (*Id.* at 110–111.) According to Marks, "when we were looking to hire an alumni director, [Daly] wanted a single woman because ... she wouldn't have a social life, so she'd have all this time for her job." (*Id.* at 174–75.) Marks testified that Daly "constantly referred to younger women as sweetie [or] cutie" and, in particular, that he referred to one of Marks' secretaries, who was in her twenties, as "sweetie, cutie and perky." (*Id.* at 176.)

Marks testified that while Daly indulged in such inappropriate comments to younger women, he "consistently ignored" Marks' other secretary who was over forty. (*Id.* at 176.) Marks also testified that Daly described Alice Murphy, who was an older women, as "terribly unattractive." (*Id.* at 177.) Marks testified further that Daly mistreated Barbara Gregorich, Director of Admissions, during or before 1995. (*Id.* at 87–92.) Daly supposedly referred to Gregorich as an "old maid" behind her back, and told Marks "he basically didn't think much of [Gregorich]." (*Id.* at 88, 91–92.) Marks alleges she was present when Daly "badgered [ ] and harassed" Gregorich and "made her feel extremely uncomfortable," though she was

unable to recall the words Daly used. (*Id.* at 87–88.) Marks further alleges that Daly fired Barbara Smith, Associate Dean of Development. (Pl.'s Mem. in Opp. at 6–7; Daly Dep. at 172.) Daly testified that due to reorganization Smith's position was made redundant and her responsibilities were inherited by Susan Greenbaum. (Daly Dep. at 54.)

Marks additionally claims that Paul Affuso, Associate Dean of Finance and Administration, was "allowed" to comment about "tit work," allegedly in reference to the duties assigned to women employees, and that he was not disciplined by Daly for joking during a sexual harassment presentation in 1995 or 1996. (Marks Dep. at 111–12.)

■ Although these remarks are more directly relevant in a hostile environment case, Daly's remarks are sufficient to support an inference of intentional discrimination in Daly's treatment of plaintiff for purposes of plaintiff's prima facie case under the *McDonnell Douglas* framework. *See Francis v. City of New York*, No. 95–CV–212 (JG), 1999 WL 369955, at *1 (E.D.N.Y. June 1, 1999) ("It is well-established that invidious comments about persons in the plaintiff's protected group may contribute to a permissible inference of discriminatory intent."). At this point the burden shifts to NYU to articulate a legitimate nondiscriminatory reason for Daly's actions.

■ NYU has offered valid nondiscriminatory reasons to satisfy its burden at this second stage of analysis. Daly explains that Marks' office was relocated because she had taken on faculty responsibilities as an Associate Clinical Professor, and "so it was determined that it would be appropriate for her to move to a faculty floor." (Daly Dep. at 91.) Daly's reason for any alleged lack of communication with Marks was that he was no longer her supervisor. (N.Y.U's Mem. in Supp. at 20 n. 11; Daly Dep. at 82–83.) Pugel stated that a "major part of the reasoning" that

led to the elimination of the Associate Deanship was that it was a new position, not well defined when it was created for Marks, and that "for whatever reasons it had not become better defined." (Kahn Aff., Ex. 6; NYU's Rule 56.1 Statement ¶ 39.) The evidence in the record suggests that Daly revoked the Separation Agreement because Marks' response to the offered Agreement attempted to vary its non-negotiable terms, and because he learned between the time he offered the Agreement and the time he revoked it that Marks was employed at Fordham. (Dehn Decl., Ex. 16; Daly Dep. at 143–47; NYU's Rule 56.1 Statement ¶¶ 21–24.) As a faculty member who was voluntarily resigning, Marks was not entitled to early retirement and severance pay. (Dehn Decl., Ex. 14; Daly Dep. at 110, 123–25; Pl.'s Mem. in Opp. at 2.) Daly testified that a "major factor" in his decision to make his October 8, 1996 offer of the Separation Agreement had been Marks' statement that she did not have another paying job. (Daly Dep. at 147.) Based on the foregoing allegations, and the record evidence submitted, NYU has met its burden of production. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (to satisfy second stage of Title VII claim, "it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff"); *Henry v. Daytop Village, Inc.*,

42 F.3d 89, 94 (2d Cir.1994) ("A defendant in a Title VII case need not prove the truth of this articulated reason in order to satisfy the second prong of the *McDonnell Douglas–Burdine* test.").

■ Plaintiff has produced insufficient evidence to carry her burden at the third stage of the *McDonnell Douglas* analysis to show that discrimination was, in fact, a motivating factor in the employment actions taken against her. As there are only assertions and no evidence that Marks was treated differently from similarly situated persons outside the relevant protected classes, Marks' case hinges on stray remarks not directed at her but at other women, almost all of which allegedly were made by Daly, many in administrative meetings, over a period of approximately three years.[19] Many of plaintiff's allegations are unspecific and for very few of them does plaintiff provide a date or a tangible job action taken against the person about whom the remark was made. The relevance of Daly's alleged remarks lie in their tendency to show that Daly had stereotypical attitudes about women in general (and, perhaps, stereotypical attitudes about older women in particular). Yet while it is true that an employer may not rely on sexual stereotypes in making employment decisions, "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The

---

**19.** Plaintiff has alleged a decrease in the proportion of female administrators in the Dean's Office between 1993 and 1995. (Pl.'s Mem. in Opp. at 7; Dehn Decl., Ex. 11). It is not clear that the staff charts supplied by plaintiff fairly represent the number of female administrators at Stern, as Daly named in his deposition *four female administrators not listed on plaintiff's most up-to-date chart.* (*Compare* Daly Dep. at 173–74 *with* Dehn Decl., Ex. 11.) The alleged decrease in the number of female administrators can not, in any case, establish discrimination because plaintiff has not produced sufficient evidence concerning the circumstances under which the various employees of the Dean's Office either were hired or departed.

The 1998 memorandum produced by the Tenured Members of the Affirmative Action Committee and Senior Women Faculty, (Dehn Decl., Ex. 12), which describes a pattern of under-representation and unequal opportunity for women professors, focuses on faculty and does not demonstrate differential treatment of female administrators, or of Marks in particular. Plaintiff's statistical evidence is far too scant to support an inference of discrimination in her case. *See Pollis v. New School for Social Research*, 132 F.3d 115, 123 (2d Cir.1997) ("If the plaintiff seeks to prove the discrimination by statistical evidence, however, the statistics must support reasonably the inference that the employer's adverse decision would not have occurred but for discrimination.").

plaintiff must show that the employer actually relied on her gender in making its decision." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *see also Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 289–91 (2d Cir.1998) (emphasizing *Price Waterhouse* requirement that plaintiff show employer relied on stereotypes); *Weinstock v. Columbia Univ.,* No. 95 Civ. 0569(JFK), 1999 WL 549006, at *9 (S.D.N.Y. July 28, 1999) (holding that "Plaintiff's allegations that she was referred to by her first name and described as 'nice' or 'nurturing,' without evidence that Defendant relied on her gender or these attributes in deciding not to grant her tenure, fail to present an issue of fact with respect to the pretextual nature of defendant's stated, non-discriminatory reason for denying Plaintiff tenure"). Here, Daly's remarks were not directed at plaintiff and there is no evidence establishing any particularized nexus between these remarks and the relocation of plaintiff's office, the absence of communication between Daly and plaintiff, the elimination of the Associate Deanship, or the revocation of the Separation Agreement.[20] In light of the nature of the remarks, the absence of

other evidence of discrimination, and the legitimate reasons provided for each employment action, the alleged remarks about other women attributed to Daly provide an insufficient basis for plaintiff to present her claims to the jury. *See Renz v. Grey Advertising, Inc.,* 135 F.3d 217, 224 (2d Cir.1997) (isolated remarks not directed at plaintiff do not establish discrimination when evidence of nondiscriminatory reason for job action is strong); *Woroski v. Nashua Corp.,* 31 F.3d 105, 109–10 & n. 2 (2d Cir.1994) (same); *see also Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 56 (2d Cir.1998) (stating in dicta that "stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination"); *Offutt v. Gannett Satellite Info. Network, Inc.,* No. 98 Civ. 0766(RPP), 1998 WL 872443, at *3 n. 1 (S.D.N.Y. Dec.14, 1998) ("Stray remarks are generally insufficient to prove discrimination." (citing *Danzer,* 151 F.3d at 56)).[21]

Based on the allegations and record evidence, no rational trier of fact could find that Marks was discriminated against by NYU in the compensations, terms, conditions or privileges of her employment.[22] Since plaintiff cannot establish a legal

**20.** The remarks attributed to Pugel and Affuso present no more nexus to the adverse employment decisions. There is no showing that Affuso shared in the decisions regarding Marks, and the only allegation concerning Pugel is that he shared Daly's view that Barbara Katz was too aggressive.

**21.** This case is distinguishable from other cases where derogatory remarks by the decisionmaker have a closer nexus to the adverse employment decision, are more pointed, or are not counterbalanced by strong evidence of a nondiscriminatory explanation for the employer's conduct. *See Cartagena v. Ogden Servs. Corp.,* 995 F.Supp. 459, 463 (S.D.N.Y. 1998) (denying summary judgment to employer when decisionmaker directed discriminatory statements at plaintiff in the course of critiquing plaintiff's work performance); *Wallengren v. Samuel French, Inc.,* 39 F.Supp.2d 343, 348, 351 (S.D.N.Y.1999) (same); *Francis v. City of New York,* No. 95–CV–212 (JG), 1999 WL 369955, at *1–*2 (E.D.N.Y. June 1, 1999) (decisionmaker's pointed remark that

persons of plaintiff's race needed to be cleaned out of the workplace held sufficient to 95–CV–212 (JG), 1999 WL 369955, at *1–*2 (E.D.N.Y. June 1, 1999)) (decisionmaker's pointed remark that persons of plaintiff's race needed to be cleaned out of the workplace held sufficient to establish discrimination).

**22.** The result would not differ if plaintiff's claims were analyzed under the *Price Waterhouse* analysis. The evidence is insufficient to show that discrimination was a motivating factor either for the purpose of sustaining plaintiff's ultimate burden at the third stage of the *McDonnell Douglas* analysis, or for the purpose establishing plaintiff's initial burden at the first stage of the *Price Waterhouse* analysis. *See Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 124 n. 4 (2d Cir.1997) (noting overlap between third stage of *McDonnell Douglas* analysis and first stage of *Price Waterhouse* analysis); *Cartagena,* 995 F.Supp. at 461 (same).

claim of employment discrimination within the limitations period, she cannot satisfy a threshold requirement of the continuing violation doctrine, and claims based on events preceding the relevant statutes of limitation are dismissed as untimely. *See, e.g., Carrasco v. New York City Off–Track Betting Corp.,* 858 F.Supp. 28, 32 (S.D.N.Y.1994). NYU's motion for summary judgment on plaintiff's claims of sex and age discrimination under Title VII, the ADEA and the NYSHRL is granted.

## D. *Discrimination Under Title IX*

As the parties point out, there is a split among the circuit courts and within the courts of this district over whether Title IX provides employees of educational institutions receiving federal funds with a private right of action to recover money damages for discrimination. *Compare Preston v. Virginia ex rel. New River Community College,* 31 F.3d 203, 204 n. 1 & 205–06 (4th Cir.1994) (recognizing right of action), *and Henschke v. New York Hosp.-Cornell Med. Ctr.,* 821 F.Supp. 166, 171–72 (S.D.N.Y.1993) (same), *with Lakoski v. James,* 66 F.3d 751, 753–54 (5th Cir.1995) (refusing to recognize right of action), *cert. denied,* 519 U.S. 947, 117 S.Ct. 357, 136 L.Ed.2d 249 (1996), *and Burrell v. City University,* 995 F.Supp. 398, 408–10 (S.D.N.Y.1998) (same). Among those courts which do recognize a private right of action under Title IX for employee discrimination claims, the standard used to evaluate such claims generally mirrors that used in Title VII cases. *See Preston,* 31 F.3d at 206–07. A key difference, however, is that courts have applied a three year statute of limitations to Title IX actions. *See, e.g., Torre v. Columbia Univ.,* No. 97 Civ. 0981(LAP), 1998 WL 386438, at *5 (S.D.N.Y. July 10, 1998), aff'd,189 F.3d 462, 1999 WL 568024 (2d Cir. July 22, 1999).

Because NYU is entitled to summary judgment on plaintiff's claims of discrimination under the NYSHRL, which also has a three year statute of limitations, the Court need not decide if a private right of action exists in order to rule on Marks' Title IX claims. Assuming, without deciding, that plaintiff has a private right of action under Title IX, her Title IX claims are dismissed for the same reason as her claims under the NYSHRL, and NYU's motion for summary judgment on all claims filed pursuant to Title IX is granted.

## E. *Wrongful Eviction*

The parties do not dispute the terms of the lease agreement which existed between Marks and NYU during her employment. (N.Y.U's Rule 56.1 Statement ¶¶ 40–41.) The Rider for Affiliated Tenants states, "The Tenant understands and agrees that the University is leasing the demised premises to the Tenant based solely upon the Tenant's full-time affiliation with the University," and also, "If the Tenant's status as a full-time employee shall expire at any time prior to the expiration of the term hereby demised, this lease may thereupon or at any time thereafter be cancelled at the sole option of the University." (Kahn Aff., Ex. 32 (Rider for Affiliated Tenants) ¶¶ 1, 4.) Plaintiff contends that "if wrongful acts by NYU forced Dr. Marks from her employment there, and if (as NYU's Director of Housing, Ray Viola, conceded at deposition) Dr. Marks would have been able to retain her university housing indefinitely if she remained an NYU employee, then her removal was unjustified." (Pl.'s Mem. in Opp. at 25.) Because plaintiff's claims of wrongful conduct by NYU have been dismissed, there is no basis for plaintiff's contention.

Even if plaintiff had remained in NYU's employ there is no evidence she would have had a right to a lease renewal. Plaintiff argues that "pursuant to NYU housing policies, it is a certainty that her lease would have been routinely renewed had she remained employed at the Stern School," and on this basis, she states a claim for damages based on the value of

the apartment subsidy for the "rest of her life." (Pl.'s Mem. in Opp. at 25 n. 9; Compl. ¶ 38.) However, Marks provides no reference to the relevant provision of NYU housing policies that gives rise to her assumption of continual renewal, and her characterization of the deposition testimony of Ray Viola that she would have been entitled to lease renewals is inaccurate. (Pl.'s Mem. in Opp. at 25.) There is no evidence to support plaintiff's conclusory allegation of routine lease renewals.

The terms of the lease indicate that Marks' tenancy expired on August 31, 1997. (Kahn Aff., Ex. 32 (Standard Form of Apartment Lease) ¶ 2; NYU Rule 56.1 Statement ¶ 40.) Marks has provided mere allegations that the lease would have been renewed but for her termination and has not produced any alternative theory or lease provision on which to rest her claim for continued tenancy. Marks has therefore failed to "set forth specific facts showing that there is a genuine issue for trial," which she must to overcome a motion for summary judgment. Fed.R.Civ.P. 56(e).

NYU's motion for summary judgment on plaintiff's wrongful eviction claim is granted.[23]

### CONCLUSION

For the foregoing reasons, NYU's motion for summary judgment is granted as to all of plaintiff's claims. The clerk shall enter judgment reflecting that plaintiff's complaint is dismissed in its entirety.

**IT IS SO ORDERED**

---

**23.** The Court exercises supplemental jurisdiction over plaintiff's wrongful eviction claim for the reasons stated previously in connection with plaintiff's breach of contract claims. *See supra* p. 89 n. 4.